GILL & FISHER, Limited, v. BROWNE.

(Circuit Court of Appeals, Third Circuit. December 23, 1892.)

1. CHARTER PARTY—CONSTRUCTION—"CONVENIENT SPEED."

A charter party made on November 5th, after describing the ship as "now trading," provided that she should sail with "all convenient speed" to Philadelphia; lay days not to commence before the 1st day of January; charterers to have the option of canceling the charter party in case the steamer was not "ready for cargo" at the port of loading on or before the 31st day of January. *Held,* that there was no implied agreement that the ship should be ready on the 1st of January unless prevented by the excepted perils, and there was no breach of the charter party when the vessel arrived on the last day of the month, it appearing that at the date of the contract she was loading at Charleston, S. C., for a voyage to Bremerhaven, which voyage she made with reasonable diligence, and that she was thereafter detained for necessary repairs. 50 Fed. Rep. 941, affirmed.

2. SAME—READINESS FOR CARGO—SUNDAY.

The ship having arrived on the last day of the month, and being then in actual readiness to receive cargo, and notice of such readiness being given on that day, the condition of the charter party was fulfilled, although the last day of the month was Sunday, and the work of loading could not begin until the following day. 50 Fed. Rep. 941, affirmed.

3. SAME—NOTICE OF READINESS.

The rule of the Philadelphia Maritime Exchange providing that, when vessels chartered to load grain at that port are ready for cargo, the notice of readiness must, to be valid, be accompanied by a certificate of readiness from the surveyors of the board of marine underwriters, cannot be regarded as incorporated into a charter party made in the city of New York for the employment of a British vessel, when the contract itself makes no reference to such rule and the owner is ignorant of its existence.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

In Admiralty. Libel by John L. Browne, owner of the steamship Harbinger, against Gill & Fisher, Limited, to recover for the breach of a charter party. The court below decreed in favor of the libelant. 50 Fed. Rep. 941. Respondents appeal. Affirmed.

R. C. McMurtrie, for appellants.

Henry Flanders, (Flanders & Pugh, on the brief,) for appellee.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

ACHESON, Circuit Judge. By a charter party dated New York, November 5, 1891, and that day executed, Gill & Fisher, Limited, of Philadelphia, chartered the British steamship Harbinger for a voyage from Philadelphia to Queenstown, Falsmouth, or Plymouth for orders, with a cargo of grain, at specified freight rates. The charter party, after describing the Harbinger as "now trading," provided "that, the said steamship being tight, staunch, and strong, and in every way fitted for the voyage, with liberty to take outward cargo

to ——— for owners' benefit, shall, with all convenient speed, sail and proceed to Philadelphia, Pa.," etc. It contained the usual clause, "The act of God, restraints of princes and rulers, the dangers of fires, the seas and navigation, accidents to boilers, machinery, etc., always excepted," and the provision, "Vessel to load under inspection of underwriter's agents, at her expense, and to comply with their rules;" and it stipulated that the 15 running lay days allowed for loading "are not to commence before the first day of January, 1892." Then followed this clause: "Should the steamer not be ready for cargo at her loading port on or before the thirty-first day of January, 1892, the charterers or their agents to have the option of canceling this charter party at any time not later than the day of steamer's readiness."

At the date of the charter party the Harbinger was at Charleston, S. C., where she had gone for a cargo of cotton for Bremerhaven, and upon completing her loading she sailed from Charleston, on or about the 23d of November, for Bremerhaven, where she arrived the 17th of December, and there unloaded her cargo, which occupied seven days. The vessel then proceeded to Shields on the Tyne, Eng., for needed repairs to her engine and for bunker coal. She reached Shields on December 26th, and was there detained in making the repairs until January 9, 1892, on which date she sailed in ballast to Philadelphia. On her voyage over, the ship encountered extraordinarily bad weather. She reached Philadelphia on Sunday, January 31st, coming to anchor in port at 2 o'clock P. M. The ballast had already been removed from the ship, and every preparation made for loading her, so that when she came to anchor she was entirely ready, so far as her condition and equipment were concerned, to receive a cargo of grain. The master immediately went ashore and to the appellants' office, but found no one there, the office being closed because it was Sunday. He then, shortly before 3 o'clock, sent a telegram to the appellants announcing that the Harbinger had arrived at 2 o'clock P. M., and was ready to receive cargo. This telegram was delivered to Mr. Barker, the managing member of the firm of Gill & Fisher, at his residence in Philadelphia, at 6 o'clock on the afternoon of the same day. About 10 o'clock the next morning, Monday, February 1st, the surveyor for the marine underwriters inspected the ship, and issued a certificate of her readiness to receive cargo, and the master then gave the appellants written notice of the ship's arrival the day before and her readiness to load, but the appellants verbally refused to load her. Later on the same day the appellants served a written notice on the master that they had elected to cancel the charter party. The ship was then rechartered at the best obtainable rate, but at a loss to the owner, freights having declined during January. It appears that the appellants on January 15th—having learned, Mr. Barker testifies, the date when the Harbinger had sailed from Shields, and believing "she could not possibly make her time of arrival"—chartered at a lower freight rate the steamship Holmlea, which had sailed from Hartlepool a week earlier, and they loaded her with the cargo they had provided for the Harbinger.

The defenses to the libel were: First, a breach of the covenant to sail to Philadelphia; second, failure to be ready to receive cargo

within the time stipulated. Both defenses were overruled by the district court, and a decree was entered in favor of the libelant, the owner of the Harbinger.

The appellants contend that there was an implied agreement that the ship should be at Philadelphia by the 1st day of January, unless prevented by the excepted perils. But the stipulation that the ship shall "with all convenient speed sail and proceed to Philadelphia" is to be read in connection with the other provisions of the charter party. Only thus can the intention of the parties be discovered. Now, it was specified that the ship was then "trading," and undoubtedly the contracting parties had regard to that important fact. Indications of this appear upon the face of the contract. No mention was made of the place from which the vessel was to sail; neither did the contract designate any date for the commencement of the voyage to Philadelphia; nor was the time within which the vessel should arrive there defined. Her lay days for loading, it will be perceived, were to begin, not on January 1st, but not before. Clearly, within the contemplation of the parties, the lay days might begin later. On the one hand the owner of the ship was not to tender her before January 1st, and on the other hand the charterers might refuse to load her if she failed to arrive by the last day of the month. The charterers did not exact from the ship a stipulation to be in Philadelphia early in January, but were content to reserve to themselves the option to cancel if she did not come during the month. That the charterers may not have known, when the contract was made, that the ship was at Charleston loading for Bremerhaven, is unimportant. They seem to have been willing to take the chance of any delay in the ship's arrival at Philadelphia caused by her fulfillment with reasonable diligence of her then existing trading engagement, whatever it might be. In Hudson v. Hill, 43 Law J. C. P. 273, a stipulation to proceed "forthwith" was held simply to mean that the vessel should go with reasonable dispatch. Here the language was "with all convenient speed," and this, we think, meant reasonable diligence with reference to the trading voyage which the ship had already undertaken. Upon this construction of the charter party there was no breach of the stipulation to proceed to Philadelphia. The evidence fully discloses the movements of the vessel, and shows that she completed her voyage to Bremerhaven and made needed repairs without any unreasonable delay, and then with proper diligence sailed and proceeded to Philadelphia.

The case of McAndrew v. Adams, 1 Bing. N. C. 29, which the appellants cite, is clearly distinguishable from the present case. There the ship was to proceed in ballast from Portsmouth to St. Michaels, two or three weeks distant, to bring back a cargo of fruit for the London market. The course of the fruit trade required expedition. The charter party was made October 20th. December 1st was named as the first of the lay days for loading. With reasonable diligence the vessel might have arrived in London by January 1st; but instead of proceeding in ballast directly to St. Michaels, the vessel went to Oporto with troops, which she was not able to land, and therefore was obliged to return to Portsmouth, and reland the troops there on No-

vember 28th. She did not finally sail on her voyage to St. Michaels until December 6th, and did not reach London until February 1st. Nor is our conclusion inconsistent with the ruling in Lowber v. Bangs, 2 Wall. 728, that a stipulation that the vessel should "proceed from Melbourne to Calcutta with all possible dispatch" required her to go directly from the one place to the other.

The second defense raises the question, was the ship "ready for cargo" within the agreed time? In the court below an unsuccessful attempt was made to establish a custom in the port of Philadelphia that where a vessel is chartered to load within a certain time, and the last day falls on Sunday, she must tender herself on the preceding Saturday. The point has not been pressed here, and it may be dismissed without comment. As already mentioned, the ship in herself was in actual readiness to receive the cargo she had contracted to carry, when she came to anchor in the port of Philadelphia. Was she "ready for cargo," within the meaning of the charter party? We think she was. Observe, the contract contemplated—indeed, expressly provided for—what actually happened, namely, the arrival of the vessel on Sunday, January 1st; and it must be assumed that the parties knew that by the law of Pennsylvania worldly labor on Sunday is forbidden, and therefore that the loading of the ship could not begin on that day, nor anything more be done on her part than was done. Again, the clause in question relates not to the act of loading, but to the ship's own readiness to take in cargo. The two things are distinct. Here the ship was ready in fact; she fulfilled the very terms of the contract. The words "ready for cargo," in the connection in which they occur, naturally refer to the condition of the ship herself, and we see nothing to indicate that they were used in any other sense.

It appears, indeed, that by the rules, adopted April 28, 1887, of the Philadelphia Maritime Exchange, an incorporated body of merchants, notice that a vessel chartered to load grain at Philadelphia is ready for cargo, to be valid, must be accompanied by a pass of the surveyors of the board of marine underwriters certifying to the vessel's readiness. But clearly these rules are not to be imported into a charter party made in the city of New York for the employment of a British vessel, when the contract itself makes no reference to them. Hick v. Tweedy, 63 Law T. (N. S.) 765. It is not shown that the Harbinger had ever before been at Philadelphia. Her foreign owner had not given his assent to these rules. They were not known to him, so far as appears. Moreover, one of the appellants' most experienced witnesses testified: "The object of this notice is to show the readiness of the vessel, so that her lay days may commence the following day." The whole evidence indicates that this is the sole purpose of serving upon the charterer the notice and accompanying surveyors' certificate. Therefore, even if upon the proofs it could be said that such a usage exists at Philadelphia distinct from the rules of the maritime exchange, still such usage could not properly affect the construction of a clause of the charter party which does not relate to the matter of lay days, but concerns the readiness of the ship to receive cargo. We have only to add that the words, "Vessel to load under the inspection of underwriters' agents, at her expense, and to comply with

their rules," do not militate against the above views; for not only does that provision manifestly refer to the act of loading the ship after acceptance by the charterer, but it strongly suggests that, if the parties meant to have the ship's readiness for cargo depend on a surveyor's certificate, they would have given expression to that intention.

Having thus reached the conclusion that the ship was "ready for cargo" on January 31st, it is not necessary for us to express an opinion upon the question whether under the general rule of law that, where the time of performance of a contract falls on Sunday, it is legally performable the next day, the ship's admitted readiness the next morning was sufficient compliance with the charter party.

The decree below is affirmed.