## DISNEY v. FURNESS, WITHY & CO., Limited.

### (District Court, D. Maryland. March 24, 1897.)

1. SHIPPING—SUITS IN MASTER'S NAME.

The master, by his general agency for the owners in relation to the ship, is authorized to sue in his own name, in their behalf, to recover damages for breach of a contract of affreightment.

2. AFFREIGHTMENT—READINESS TO RECEIVE CARGO—SUNDAYS.

A provision in a contract of affreightment that the shippers may cancel the contract if the steamer "be not ready for cargo on or before March 15, 1896," gives the steamer the whole of that day, though it falls upon Sunday, and she is not required to be ready on the preceding Saturday.

3. SAME—STATE OF READINESS—SHIFTING BOARDS FOR GRAIN CARGO.

Failure of the ship to have up the top board of the shifting boards, where the board and the slots for receiving it are fitted and prepared, is not a want of readiness to receive grain cargo, such as would authorize the cancellation of the contract of affreightment. Nor is cancellation authorized by failure to have up the shifting boards in the hatch combings, as these, if used at all, are better put in when the cargo is partly loaded.

4. SAME.

A practice peculiar to the port of lading, which requires battening of the seams even when not needed, and merely out of abundant caution, cannot, without previous notice, authorize the shipper to cancel the contract for want of such unnecessary battening.

**5.** SAME—CLEANLINESS OF HOLD.

A provision giving the shippers the right to cancel the contract for shipment of a cargo of grain if the ship be not ready on a given date requires a practical and substantial readiness to receive the cargo such as would insure the underwriters' inspector's approval, and obtain his pass, and would gratify the usual and reasonable requirements for avoiding injury to the commercial value of the grain.

This libel was filed March 19, 1896, on behalf of Messrs. Rickinson, Son & Co., of West Hartlepool, England, owners of the British steamship "Aries," to recover the damages caused by the refusal of the respondents to load the steamship when tendered to them, on March 15, 1896, at Newport News, Va., in violation, as the libelants allege, of a contract of affreightment.

The contract stipulated that the shippers should have the right to cancel the contract if the steamer was not ready for cargo on or before March 15, 1896. The steamer arrived at Newport News about 10 o'clock in the evening of March 15, 1896. She was entered immediately at the customhouse, and procured the underwriters' surveyor's pass to load grain in all her holds, and at 10 minutes before 12 o'clock p. m. was tendered by the master to the respondents, as ready to receive cargo. The respondents' agent refused to accept the steamer, stating, as the reason for the refusal, that the shifting boards were not fitted in her hatch combings, and notified the master that the respondents elected to cancel the contract. The controversy hinges upon whether the steamer was ready before midnight on March 15th to receive cargo according to the requirements of the contract.

The contract is as follows:

"Berth Terms Contract between Furness, Withy & Co., Ltd., and Patterson, Ramsay & Co., Acting as Agents for Owners of the S. S. Aries, by Cable Authority of Jackson Bros. & Cory, dated London, 16th Jany., 1896.

"Engaged from Furness, Withy & Co., Ltd., for shipment in the S. S. Aries, classified 100 A 1, in British Lloyds: Twenty thousand quarters (20,000 qrs.) of grain, 10%, more or less, at steamer's option, to a direct port in the United Kingdom, or to Rotterdam, Amsterdam, or Antwerp, one port only, as ordered on signing bills of lading, at two shillings and ten pence halfpenny (2—10½) per quarter of 480 lbs. The vessel to load Newport News and/or Norfolk, Va., employing shippers, stevedore at customary rates. The cargo to be ready when called for, not earlier than the 15th February, 1896. Shippers having the right of canceling the contract if the steamer be not ready for cargo on or before March 15th, 1896. Cargo to be loaded as fast as the vessel can take it, and to be discharged in like manner with all dispatch. Shippers have the right of shipping cargo other than grain (being lawful merchandise) not exceeding two thousand (2,000) tons, they paying all additional expense above what grain cargo would cost, and total freight to be equivalent to full cargo of grain at two shillings and ten pence halfpenny (2—10½) per quarter, as above. This engagement to be subject to all the conditions of the 'Berth Bill of Lading' to any United Kingdom port, to Rotterdam, to Amsterdam, or to Antwerp, in customary use at Newport News and/or Norfolk, Va. Full cargo insurance to apply in vessel's favor, if required. The steamer is to be consigned to the agents of Furness, Withy & Co., Ltd., at port or ports of loading and port of discharge on customary terms. One and a quarter per cent. freight brokerage is to be paid to Furness, Withy & Co., Ltd., at port of loading, as usual, and the commission of one and a quarter per cent. (1¼%) to Patterson, Ramsay & Co. It is mutually agreed that this contract is subject to all the terms and provisions of and all the exemption from liability contained in the act of congress of the United States approved on the 13th day of February, 1893, and entitled 'An Act relating to navigation of vessels,' &c.

"H. O. Haughton,                    Patterson, Ramsay & Co., Agts.,
    "Witness.
"O. L. Williamson,              Per pro. Furness, Withy & Co., Ltd.,
    "Witness.                                      C. W. Browley.
"Dated Baltimore, January 18, 1896."

By a subsequent agreement, the shipper's privilege of shipping not exceeding 2,000 tons of other cargo than grain was increased to 3,000 tons. The steamer was a new steel ship, built under special survey, and held the highest rating in Lloyds' Register. She had no between decks, and was fitted out when built with a complete equipment of shifting boards constructed to be placed in the iron stanchions which supported her deck, and fitted with iron braces or shores. She had left England on her first voyage in September previous, and had carried a cargo of coal to the East Indies, and brought a full cargo of dry Java sugar, in baskets, to the United States, consigned to the respondents. Under that contract she was to report to the respondents at the Delaware Breakwater for orders directing where to deliver the sugar, and the respondents ordered her to Boston. She had had head winds and a long voyage from Gibraltar, and had been obliged to stop at Bermuda for coal. She arrived at the Delaware Breakwater on February 26, 1896, and, getting orders to go to Boston, she was obliged to go first to Philadelphia for coal. She arrived in Boston March 9th, finished discharging the sugar on the 13th, and left Boston for Newport News at noon of that day.

It was on his arrival at the Delaware Breakwater, on February 26th, that the master of the Aries first learned of the contract of January 18, 1896; and it was quite apparent from the time of the steamship's arrival in Boston, on March 9th, that it would be all she could do to be in readiness to receive cargo in Newport News on the 15th. Freights had fallen considerably between January 18th, the date of the contract, and the middle of March, so that on the freight of this large ship, capable of carrying 21,000 quarters of grain, it made a difference of about $5,000 whether the ship was loaded at the contract rate or at the current market rate. With this large sum at stake, it is easy to understand that the master and agents of the ship were anxious to have her in readiness to perform the contract, if possible, and that the agents of the respondents were anxious to refuse to load her if they could find any ground of objection which would release them. The difference and conflict between the witnesses as to what constituted a fair standard of readiness to receive a cargo of grain may be explained in part, at least, by the side of this controversy on which they became enlisted, and was complicated somewhat, I think, by the fact that at Newport News the respondents largely controlled the shipping of grain by foreign steamers, and afforded employment to the persons connected with that business there.

Wishing to learn as early as possible for what cargo the Aries was required to be ready, her agents applied from time to time to the agents of the respondents in Baltimore to be informed if they desired her fitted for a full cargo of grain, or for a general cargo including grain, and were told that a definite answer could not yet be given. On the 15th, at Newport News. Mr. Chase, acting for the libelants, made the same inquiry, and was answered that it was intended to load her with a full cargo of grain. The steamer arrived at Newport News at 10 o'clock on Sunday night, March 15th. Mr. Chase, representing the owners, Mr. Haughton, the underwriters' surveyor, Mr. Berner, representing the shippers, Capt. Smith, the shipper's marine superintendent at Newport News, together with a carpenter and a ship chandler, went aboard. The master at once went ashore, and entered the vessel at the customhouse, and, returning, gave notice about 11 o'clock that the ship was ready to receive her cargo. The shipper's agent replied that the notice could not be accepted unless accompanied by a surveyor's pass. The master then obtained from Mr. Haughton, the surveyor of the board of underwriters of New York, who had come aboard on her arrival to inspect her, a certificate that the steamer was passed to load grain in all her holds, the holds having been prepared in accordance with the rules of the board of underwriters of New York, with the indorsement that the shifting boards were up to deck fore and aft, but not in the hatch combings. At 11:50 the master renewed the tender of the ship in writing, accompanied with the surveyor's pass, certifying to her readiness to receive cargo. The shipper's agent at once replied in writing that the surveyor's pass was not in accordance with the regulations, as the shifting boards were not fitted in the hatch combings, and declined to accept the ship, and notified the master that the contract of January 18th was canceled. The carpenter's men at once went to work to fit the shifting boards into the hatch combings, and they also, without, it would appear, distinct orders from any

one, proceeded to nail battens over the seams of the bottom of the ship, and, by 7 o'clock on Monday morning, had finished all they undertook to do. About 10 o'clock Monday morning, by request of respondents' agent, another underwriters' surveyor, Mr. Lauder, from Norfolk, who was called as a witness by the respondents, together with Mr. Smith, the respondents' marine superintendent, and Mr. Tyler, superintendent of the grain elevators, and some others, came aboard, and proceeded to make a very searching examination of the ship. Mr. Lauder found the shifting boards all up to the top of the hatches. He considered the battens unnecessary if the bottom of the ship was tight without them. So, in order to see if there were open seams under the battens, he had them ripped off, and, upon a careful search, he found 18 feet of the limber seams open three-sixteenths of an inch, and about 36 feet of the ceiling not over the limbers, but over the water ballast tank, open about one-fourth of an inch. These 53 feet in all, he thought, might let some kinds of grain through, and should be battened. But he was unwilling to state that they were sufficient to have required Mr. Haughton to refuse her a pass to load, or that he himself would have refused a pass if he had been called upon to inspect her for a grain cargo. As to the cleanliness of the holds, he noticed nothing out of the way, except some sloppiness under the hatches, which he said might have come from rain during the night of the 15th. Mr. Smith, the marine superintendent of the respondents, was present at this inspection, on Monday morning, and went into the holds with Capt. Lauder; and he testified that Nos. 1 and 2 holds were very dirty; that the remains of the sugar cargo had covered parts of the flooring and the sides of the ship with a dirty paste. Mr. Vaughan, the carpenter, testified to the same. Mr. Tyler, grain inspector at the Newport News elevators, who was sent for by the respondents' agent to examine the vessel, testified that Nos. 1 and 2 holds were gummed up with sugar and molasses, and that he required all her holds to be cleaned and limed, and her beams scraped and limed, and her boards cleaned and limed, before he would accept the ship for a cargo of grain.

On the afternoon of Monday, March 16th, the respondents, by letter, confirmed their rejection of the ship, because she had not been ready for a full cargo of grain on March 15th, and offered to load her at a reduction of 10½ pence per quarter on the contract rate of freight. The respondents persisting in their refusal to load the ship, a new charter was signed on the 20th, at the proposed reduction, without prejudice to any claims for damage under the contract of January 18th. Under the new charter, the respondents loaded the Aries with a mixed cargo, consisting of oats in bulk in No. 2 hold, and flour in bags and other cargo in the other holds. Nothing was done to these holds except that they were limed on Monday, the 16th, and in No. 2 a few battens were nailed down. It is proven that she carried and delivered this cargo without damage of any sort. With respect to the condition of the ship after unloading her cargo of sugar in Boston, all the stevedores and other persons concerned in it were examined on behalf of the libelants. They appear to have been an intelligent and fair-minded set of men, some of them employed by the respondents, and none of them in the employ of the libelants, and they all testified that dry Java sugar in baskets is a clean cargo, which does not run to molasses; that the baskets are frequently broken in hoisting them out of the holds, but that the unloading in Boston was during the coldest weather of that winter, and the sugar ran like dry sand, and did not cake or gum up the holds; that mats had been used for dunnage, to keep the baskets of sugar from the sides of the ship; that the holds were carefully cleaned up, so as to get out every pound of sugar, and were left clean enough for any cargo to be put in. The testimony is also that, on the voyage from Boston to Newport News, the master, assuming that he might be required to be in readiness for a cargo of grain, had the crew engaged all the voyage in putting up the shifting boards, and in cleaning the holds again, and liming them, to make sure that they were clean and without smell. The Boston pilot, who brought the ship around, testified to the same effect. The customhouse inspector at Newport News, whose duty required him to remain on board the steamer during the time she was in the port, and who for three years had been on duty on similar vessels, waiting to load grain, testified that the holds appeared to him very clean on Monday, and as fit for grain as any vessel he had seen; that all

that he noticed done afterwards before the ship was loaded under the new charter was that some lime was spread about in some places in the holds.

Brown & Brune, for libelants.
John H. Thomas, for respondents.

MORRIS, District Judge. It was objected in argument that this suit was improperly brought in the name of Disney, the master of the Aries, on behalf of himself and the owners, but should have been brought in the names of the owners themselves. This objection was not taken in the answer, which admits that Disney is the master and bailee of the ship.

In Benedict's Admiralty (3d Ed. § 384) the rule is thus stated:

"The master's general agency for the owner in relation to the ship and his special property in her and her cargo and freight authorizes him to bring in his own name actions which the owners have in relation to the ship, her cargo or freight."

This is the generally received rule. In Commander-in-Chief, 1 Wall. 43–51, it is recognized as proper practice, and it is suggested that objection for want of proper parties should be seasonably made, so that they may be added by supplemental libel or petition or amendment.

Another defense suggested in argument is that, as March 15th was Sunday, the import of the contract was that the ship must be ready for cargo on Saturday, the 14th. The rule with regard to the payment of commercial paper is cited in support of the contention. The contract was negotiated and signed by the Baltimore agents of both the parties to it, and their mutual understanding of what the contract meant is shown by their actions under it. All their actions appear to have been based upon the mutual assumption that the contract intended the 15th as the day of readiness. The answer is framed upon this assumption. The objection that Saturday, the 14th, was the last day for tendering the vessel, is first suggested now in argument. The payment of promissory notes on Saturday when the due day falls on Sunday is established by general commercial usage; but this usage is not applicable to contracts which fix a day for the performance of a stipulated act, other than the payment of commercial paper; the rule in such case appears rather to be that a performance on Monday is a compliance. 2 Chit. Cont. (11th Ed.) 1066, note n; Stebbins v. Leowolf, 3 Cush. 137–144. In The Harbinger, 50 Fed. 941, affirmed in 3 U. S. App. 333, 3 C. C. A. 573, and 53 Fed. 394, it was held where, in a charter party, the canceling day on which the vessel should be at Philadelphia, "ready for cargo," fell on Sunday, it was a compliance if the vessel arrived in port on that day ready for cargo, although, by reason of its being Sunday, she could neither be entered at the customhouse, nor procure a pass to load from the underwriters' surveyor. In the case in hand, the respondents having agreed that the shipowners should have the whole of the 15th to get ready, I think it was a compliance if the vessel was in readiness on that day.

The real controversy in this case hinges upon the right of the respondents to cancel the contract upon the ground that the ship was not ready for a cargo of grain on Sunday, March 15th. The objections which the respondents raised were to the shifting boards, to the absence of battens over the seams of the floors and limbers, and to the unfit condition of the holds for a cargo of grain, by reason of the remains of the sugar.

The contract stipulated that the ship, on the 15th of March, should be in her equipment and condition reasonably ready for a grain cargo, if the respondents so required, although there is no proof that the respondents had a grain cargo at Newport News ready for her, and although, a few days later, under the new charter, they loaded her with a very different cargo. But the readiness required was a reasonable readiness, and not a special readiness to gratify particular requirements established by the respondents. This vessel was a new one, not six months old. She had been, when built, fitted out with the shifting boards required for grain cargoes. She did not need the special fittings put by carpenters into vessels not so built. Her shifting boards were all on board, and only required to be dropped into the slots in her iron stanchions, and the iron braces or shores put in place. The defects relied upon, that in two holds the top board had not been put up, was not really a want of readiness. The boards were there, and the slots to hold them. It was a matter of a few minutes to put them in place, and they were put in place before midnight. It is often a convenience in loading not to put the top board up until the grain is partly in. The bulk grain is not allowed in vessels of the Aries type to come higher than $5\frac{1}{2}$ feet from the deck, the remaining space, for greater safety, being required to be filled with grain in bags. And so, with regard to shifting boards in the hatch combings, they are not usually required or desirable, and, if used at all, are better put in when the cargo is partly loaded. Neither of these alleged omissions is, in the absence of a specific notice that they are required, a defect in readiness, authorizing the canceling of the contract.

With regard to the battens, the testimony of those employed in fitting vessels for grain at Newport News, and of the grain inspector of the elevators there, tends to show that they require all the seams of the limbers and the floors of the holds to be battened, whether the cracks are such as to let grain through or not. But the testimony of the underwriters' inspectors, who issue the surveyor's pass, is that only such seams as are sufficiently open to admit grain, which might choke the pumps, are required to be battened. Obviously, a practice peculiar to the port, requiring battening when not needed, and merely out of abundant caution, could not, without previous notice, give ground for canceling the contract. The carpenters, apparently without distinct orders, but because it was their practice to do so, went to work on Sunday night, and battened all the seams; and by Monday morning, and before the vessel could be actually used, she gratified every supposed requirement in that respect. But I think the preponderance

of proof is that in this new ship the very few seams which were in the least degree open were not sufficient to excite apprehension of any risk, either to the ship or the cargo. It is quite apparent that neither of the underwriters' surveyors thought so (and they represent the interests most hurt by such defects), and that, except for the great desire to escape from the contract, objection would not have been seriously made by any one.

The other objection now most earnestly insisted upon is that the remains of the sugar cargo left the holds unfit to receive grain. It is in evidence that the dry Java sugar in baskets was a clean cargo; that it was discharged in very cold weather; that it was so dry that it could be readily swept up; that the sides of the vessel were protected by mats; that, with a knowledge that the vessel would be required to be ready on her arrival for a grain cargo, her master prepared her specially for it. Her holds were considered clean by the persons who discharged her in Boston, under the employment of the respondents, as appears from the statement of Mr. Smith, that they had heard through respondents' agents that the ship had been thoroughly cleaned, and all the dirt got rid of, before she left Boston. It is probable that her coal cargo had discolored the floorings, and may have left some coal dust in the crevices, and may have given the impression that she was dirty. One set of respondents' witnesses testify that the seams of the flooring and limbers were open, and another set that they were gummed up with molasses. One would suppose that the gummy substance would have calked the seams, and at least have concealed the openings. Very likely it was possible, by diligent searching, to find places and crevices in which there were remains of the sugar cargo, and there may have been some stickiness on the rungs of the ladders, and on the edges of the shifting boards, and the discoloration from the coal may have given everything a dirty look; but it does not appear that these trifling matters made her unfit for a grain cargo. She was a perfectly tight ship, of the best modern construction. It is shown that the respondents loaded her with oats, and with flour in bags, a much more sensitive cargo than grain, without anything having been done to her except the scattering of some lime in her holds, which was done early Monday morning, and the putting down of a few battens, and without any further inspection.

It is said that charter parties (and this contract is even less formal than a charter party) should have a liberal construction, such as mercantile instruments usually receive, in furtherance of the real intention of the parties and the usage of trade. Raymond v. Tyson, 17 How. 53–59. In this case the readiness for cargo contemplated was a practical and substantial readiness, such as would insure the underwriters' inspector's approval, and obtain his pass, and would gratify the usual and reasonable requirements for avoiding injury to the commercial value of the grain. It did not contemplate a nice criticism of matters not essential and not usually insisted upon, and which could not affect any purpose the shippers could have had in contracting to freight the ship, and which did not in fact injure them at all. I think the owners of the steamship should recover such damages as they may be able to prove.