BONANNO et al. v. TWEEDIE TRADING CO.

(District Court, S. D. New York. October 1, 1902.)

1. SHIPPING—CHARTER PARTY—ACTION OF CHARTERER IN PREVENTING ENTRY OF VESSEL AT CUSTOM HOUSE.

A charterer who by obstructive tactics prevents the owner from entering the vessel at the custom house before the time she was required by the charter to be tendered for loading will not be permitted to avail himself of the fact that she was not so entered as a ground for canceling the charter.

2. SAME—TENDER OF VESSEL FOR LOADING—CUSTOM OF PORT.

To establish a custom of a port requiring vessels to be entered at the customhouse before they can be tendered for loading, to save a cancellation date, it must be shown to be so general and notorious that all persons dealing in the market are presumed to have knowledge of it. Evidence held insufficient to establish such a custom at the port of Baltimore.

3. SAME—CONSTRUCTION OF CHARTER—NOTICE OF READINESS TO LOAD.

A charter provided that loading should commence when written notice was given of the steamer being ready to load, "such notice to be given

---

¶ 3. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

between business hours of 9 a. m. and 5 p. m., or 1 p. m. on Saturdays." It was also provided in another clause that, if the ship should not be ready in loading dock before 9 a. m. on April 15th, the charterer should have the option of canceling the charter, to be declared on notice of readiness being given. The vessel arrived at the designated dock on Sunday, April 14th, and gave notice of readiness to load, and a second notice before 9 a. m. Monday. The charterer refused to recognize these notices, claiming that notice could not legally be given, under the terms of the contract, later than 1 p. m. on Saturday, and, on notice being again given after 9 o'clock, it declared its intention to cancel the charter; the purpose being to force a lower rate, freights having declined after the charter was made. *Held,* that the only purpose of the requirement that notice should be given in business hours was to prevent the running of demurrage at a time when the charterer could not load, and that, the vessel being ready to load within the stipulated time, the charter was not subject to cancellation, but she might still give the notice within a reasonable time, any delay being at the expense of the owner.

In Admiralty. Action for breach of charter party.

Ullo & Ruebsamen, for libellants.

Wheeler & Cortis, for respondent.

ADAMS, District Judge. This is an action brought by the owners of the steamship "Vincenzo Bonanno" against the respondent to recover damages alleged to have been sustained through the breach of a charter party made in New York on the 8th day of November, 1900. The main features of the case have been agreed upon and may be briefly stated as follows:

The charter party described the vessel to be "now trading and expected to be ready to load in March, 1901," and provided that she should with all possible despatch proceed to Baltimore, Maryland, or Newport News, Virginia, and there load * * * from the charterer on such dock as might be ordered by it "on or before arrival in New York" a cargo of coal and therewith proceed to certain Mediterranean ports. The charter party further provided:

"2. A sailing telegram to be sent to the Charterers on Steamer leaving her last port, or in default twenty-four hours more to be allowed for loading."

"3. The cargo to be loaded at the rate of 1,000 tons per day (* * *) commencing when written notice is given of Steamer being completely discharged of inward cargo and ballast in all her holds and ready to load, such notice to be given between business hours of 9 a. m. and 5 p. m., or 1 p. m. on Saturdays * * *."

"12. Loading hours not to commence before 9 a. m. on ―――― if Ship be not ready in loading dock as ordered before 9 a. m. on April 15th * * * Charterers to have the option of cancelling this Charter, such option to be declared on notice of readiness being given."

The proper notice under paragraph 2 of the charter party was duly given on the 5th day of April to the charterer in New York. On the following day the charterer declared Baltimore to be its option as the place of loading, whereupon the ship's agents called attention to the clause which required the vessel to be in her loading berth before 9 o'clock a. m. of April 15th, and asked, as the ship would have a narrow margin in her cancellation date, that orders be given on or before arrival in New York as to the berth. This request was repeated on the 9th day of April on which day the vessel arrived in New York. On the 10th day of April, the charterer promised to name the berth before

the vessel should be ready to sail from New York. On the 12th of April the owners' agents notified the charterer that the steamer would sail for Baltimore at noon on that day and asked that the berth be named before the sailing and on the same day the charterer ordered that she be sent to the wharf of Shaw Brothers, in Baltimore, and be tendered when ready at the office of Barker & McCall, Baltimore. On the same day the ship's agents notified the charterer that the ship was completely discharged of inward cargo and ballast in all the holds, and was proceeding to Baltimore ready to load as ordered. On the same day, the charterer notified the ship's agents that if duly tendered in Baltimore, it would load the ship, but if not tendered within what it considered charter time, it would decide whether it would cancel or not. Later in the day, the charterer notified the ship's agents that its appointment of a berth in Baltimore was based upon a misapprehension of the position taken by them with respect to the time the ship should be ready and tendered in Baltimore, the charterer supposing that the ship's agents conceded the correctness of the charterer's position that the ship must be tendered ready in her loading berth before 1 o'clock p. m. Saturday April 13th, but learning that the ship's agents contested that point, the charterer protested and reserved its rights. Subject however to the protest and reservation, the designation of the wharf mentioned was allowed to stand.

The scene now shifted to Baltimore. The vessel arrived there on Sunday, the 14th day of April, and was duly berthed at the wharf in question and was then in readiness for loading Monday, except so far as the readiness was affected by the obtainment of requisite papers from the Custom House.

The owners sought assiduously to have all the Custom House requirements supplied before 9 o'clock Monday, so that the vessel would then have her papers and be, without question, in legal readiness to perform her contract before that hour, and would have succeeded if the charterer had not interposed obstacles to prevent. Arrangements were made to have the vessel entered at 8:30 o'clock Monday, a half hour before the usual business hours at the Custom House, so as to obviate any possible difficulty with respect to necessary formalities before 9 o'clock. The vessel had been entered in New York from her foreign voyage and was, for the time being, simply in a condition to require action upon a vessel in water ballast. Under the circumstances, it was usual, and not in contravention of statutory law or any regulation of the Treasury Department, for the Custom House officials in Baltimore to facilitate vessels in getting to work. With this view the Custom House was opened before the usual hour of 9 o'clock Monday morning, but the charterer attended there and protested that any action before 9 o'clock would be irregular on the part of the Custom House officials and they would be held responsible for any damages that should occur therefrom. The officials naturally refrained from acting, with the result that the formalities were not completed until after 9 o'clock. There is a very grave doubt whether in view of the vessel's arrival and readiness on Sunday, it was necessary for her to be so entered to save the cancelling date (The Harbinger [D. C.]

117 F.—63

50 Fed. 941; Gill v. Browne, 3 C. C. A. 573, 53 Fed. 394; Disney v. Furness [D. C.] 79 Fed. 810), but if such doubt should be resolved in favor of the charterer, on account of the particular wording of this contract, it would still leave the charterer in the position of having prevented a compliance by obstructive tactics, which the court could not permit it to take advantage of (Mining Co. v. Humble, 153 U. S. 540, 552, 14 Sup. Ct. 876, 38 L. Ed. 814).

There was an attempt on the part of the charterer to show that there was a custom in the port of Baltimore requiring vessels to be entered at the Custom House before they could be tendered as ready to save a cancelling date. This charter was under what is known as a Welsh form of coal charter, which had only been used in Baltimore for a short time and was little known. In order that such a custom could have any effect, it would not only have to be consistent with the contract—or at least not inconsistent with it—but shown to be so general and notorious that persons dealing in the market could easily ascertain it and should be presumed to have been aware of it. Carv. Car. by Sea, § 185. The evidence failed to establish the existence of such a custom in Baltimore.

The point which presents the most difficulty is that with reference to the notice of readiness. If the owners failed to give the notice according to the terms of the contract, they must abide by the consequences. It is not a question de minimis but of contract. The owners gave notice Sunday, the 14th, and repeated it Monday before 9 o'clock. The charterer refused to recognize these notices. Notice was given again, shortly after 9 o'clock Monday, and then the charterer announced its intention of cancelling. Assuming that the vessel was in readiness to load at 9 o'clock Monday, was it still open for the owner to give the required notice of the readiness? The contention of the charterer is that it was impossible for the owners to give notice under the contract unless the vessel arrived in Baltimore before 1 o'clock Saturday, because the time of notice being confined to loading hours between 9 a. m. and 5 p. m. there could be no opportunity for legal notice Monday. According to this contention, though it should become impossible for the owners to fulfill their contract through the vessel sailing from New York too late to arrive in time Saturday morning to berth and give notice, it could still insist upon the vessel being sent to Baltimore before the exercise of its option could be called for and could wait until a notice should be given, which could not be legally given, before declining to load the vessel, even though she was actually ready to begin loading at the stipulated hour Monday at 9 a. m. The contention has little to recommend it. It is urged in extenuation of the position assumed that the vessel under the contract was required to sail from abroad before she did and took the risk of a late arrival. This is possibly true, though the facts in that connection have not been developed in the absence of an issue upon the point. No doubt the owner took the risk of being subjected to a claim for damages, if a late arrival of the vessel should cause any, but the late arrival did not subject them to a forfeiture of the contract, unless it frustrated the adventure, of which there is no claim. The

exaction must depend for sustainment upon the letter of the bond and there is a grave question whether the charterer is in a situation to have its claim allowed in a court of equity. It is said in Carv. Car. by Sea, treating of conditions precedent, (section 177):

"And if the charterer, knowing that a condition of the contract is not satisfied, still allows the owner to act upon the charter party, e. g., by sending his ship to the loading port, he cannot afterwards rely upon the breach of that condition as an excuse for not loading her."

In the case of Dimech v. Corlett, 12 Moore, P. C., cited in support of the test, there was a question of the breach of a condition precedent in a charter party, through the failure of the owners of the vessel building at Malta to complete her in time, for a voyage to Alexandria. Upon arrival at Alexandria the breach was insisted upon. In delivering the judgment, it was said by Sir John T. Coleridge (page 227):

"It is to be presumed that the Respondent, residing at Malta, knew of the delay in the completion of the vessel, and of the time when it was ultimately in a condition to sail; if so, and he had intended to insist that the charter-party was no longer binding, nothing would have been more easy or just than to give notice to the Appellant that he so regarded it."

And see Behn v. Burness, 32 L. J. Q. B. 204, 208.

In the case at bar it appears that the vessel could not reach Baltimore in time to fulfil the conditions of readiness and notice for which the charterer contended, and the charterer must have been aware of that fact, yet not only did it allow the vessel to proceed to Baltimore, upon what it deemed a fruitless voyage, so far as she was concerned, but insisted upon her going, all the time intending to take advantage of the situation to compel the owner to consent to a reduction in the rate of freight, the market having declined before the time of performance was reached.

It is not necessary, however, to rest the decision upon the doctrine of estoppel stated, unless the charterer has made out a sufficiently clear case to establish such a construction of the charter party as would justify the allowance of a cancellation apart from it. In Dimech v. Corlett, supra, it was said (page 224):

"It is important not to give to mercantile instruments, such as this, an unnecessarily strict construction, but such a one as, with reference to the context, and the object of the contract, will best effectuate the obvious and expressed intent of the parties."

The intent of the parties here was to provide for the transportation of a cargo of coal at an agreed rate. The vessel was on hand and in readiness to commence loading at the stipulated time. The cargo was ready and there was nothing to prevent the completion of the contract but a question of technical notice claimed by the charterer, which, if allowed, would result in the owners being compelled to take a lower rate of freight than that agreed upon. All considerations of justice are adverse to permitting a cancellation of the contract to effectuate such purpose, in the absence of an unequivocal expression of intent that the right should exist. To sustain its contention, the charterer insists that clauses 3 and 12 of the charter party must be read together so that, as stated above, there could not possibly be a notice of readi-

ness given until after 9 o'clock Monday and that then it was too late for it to be given. Clause 3 related to the loading and payment for loss of time in case of detention. Under that clause, the evident purpose of the provision for the giving of notice of readiness in business hours was to prevent the running of demurrage at a time when the charterer would have no opportunity of loading. There is no necessary connection between the two clauses, as I read them, which would import into the contract, an obligation upon the owners to give the notice within those hours under pain of cancellation of the charter if they failed. A failure would result merely in loss of time, which the owners would have to suffer. Every second of time up to 9 o'clock belonged to the owners to get the vessel in readiness, and when, practically, was the notice to be given if not after 9 o'clock in order to carry out the contract? The answer of the charterer would be that notice could not, practically, be given after 1 o'clock Saturday, but as that would cut off the owners' time to get ready up to 9 o'clock Monday, it cannot be sustained. It seems to me that the intention was to compel the owners to give notice within a reasonable time, after the vessel should be ready within the contract limits, any delay being at the owners' expense, and that the charterer should then have a reasonable time to declare its option. I hold that notice to the charterer was duly given.

It is claimed by the charterer that if the libel is sustained, the damages should be assessed at one shilling per ton, as the charterer offered to load the vessel, reserving all rights, upon a precisely similar charter at that much less than the rate provided for in the charter which is the subject of the dispute. The libellants on the other hand claim that the offer was only conditional and that they actually suffered damages in a much larger sum, which they can show upon a reference. The reference is allowed but if it should turn out that the measure of damages is governed by the offer, the expense will have to be borne by the libellants.

Decree for libellants with order of reference.