ANVIL MINING COMPANY *v.* HUMBLE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF MICHIGAN.

No. 323. Argued March 26, 27, 1894. — Decided May 14, 1894.

A provision in a contract for the mining, removing, and loading by the party
of the first part of ore from a mine of the party of the second part, that
the party of the second part may be at liberty to terminate it at any time
when he shall be satisfied that the system employed by the party of the
first part is prejudicial to the welfare and development of the mine, and
that, in that event, there shall be a reference to determine the damages
sustained by the party of the first part by reason of the termination, does
not give the party of the second part a right arbitrarily to terminate the
contract, but only to do so when it is determined that the system em-
ployed is prejudicial to the future welfare and development of the mine.

A contract made for the extract of ore from the first level of a mine pro-
vided that the ore should contain at least 56 per cent of metallic iron.
Subsequently the parties extended the contract so as to include the ore
contained on and above the second and third levels, with the exception
that the ore extracted under this contract should contain at least 58 per
cent of metallic ore. *Held*, that this stipulation was applicable only to
the ore taken from the second and third levels.

Whenever one party to a contract is guilty of such a breach as is here attrib-
uted to the defendant the other party may treat the contract as broken,
and may abandon it, and recover as damages the profits he would have
received through full performance, which measure of profits was within
the intent of both parties when the contract was made, and could be
ascertained without difficulty.

A letter of a party to the suit bearing upon the issues introduced in
evidence against him, may be explained by him as a witness in his own
behalf, and its effect upon the issues and the force of the explanation
are proper subjects for the consideration of the jury.

By the terms of the contract in this case the amount due the plaintiffs from
time to time was to be determined by the weigh-bills, which were in
the possession of the defendant's bookkeeper. The plaintiff applied to
the bookkeeper for information on this point, and received a reply.
*Held*, that that was competent evidence on that point.

ON May 1, 1888, John Humble, Joseph H. Johns, and
James Johns, who were partners doing business under the
firm name of Johns Brothers & Humble, entered into a con-
tract with the Anvil Mining Company for mining iron ore.

The provisions of the contract, so far as they are material are that "they, the said party of the first part, shall and will in a good and workmanlike manner, and at their own proper charge and expense, mine, remove, and load into the skips all the merchantable iron ore contained on or above the first level of the mine now owned and worked by the said Anvil Mining Company at its No. 1 shaft, in said township of Bessemer. The said ore shall be mined and removed by what is known as the caving system, and the ore removed shall be at least seventy-five per cent (75 per cent) of the merchantable iron ore contained on or above said first level, and shall be worked, taken out, and removed in such manner as not to interfere with the future workings and development of said mine. Said party of the first part shall work said mine to its full capacity, and remove the ore therefrom without unnecessary delay, and shall mine from said level at least two hundred (200) tons of merchantable iron ore per day ; that is, the average amount of ore removed each month shall not be less than two hundred (200) tons per day.

"It is understood and agreed between the parties hereto that should it be determined by said second party that the ore from the second and third levels of said mine can be removed and extracted by the caving system of mining, or by the same system practised in removing the ore from the said first level, that this contract, at the option of said second party, shall extend to and include the ore contained on and above the second and third levels of said mine.

"It is also agreed that it shall be entirely optional with said party of the second part to extend the contract to the ore below the second level, and that the said party of the second part shall have the right of terminating this contract and the said system of mining at any time when said second party shall decide that said system is prejudicial to the future welfare and development of said mine ; equitable compensation to be made said party of the first part for damage suffered by them by reason of the said party of the second part so terminating this contract, and should said parties be unable to agree upon the basis of settlement, then the matter

shall be left to two disinterested mining superintendents, one to be chosen by the party of the first part, and the other to be chosen by the party of the second part, and in case said referees fail to agree, they shall choose a third, and the decision of said referees, or the majority of them, shall be final and conclusive upon the parties hereto as to the compensation to be made said party of the first part because of the termination of this contract.

"The said party of the first part agrees that the said party of the second part shall have the use of number one shaft for the purpose of raising either rock or ore from said mine, in the sinking of said shaft and developing said mine below the first level. This privilege to use number one shaft is to be considered to apply only to the removal of ore, rock, or other material necessary to be taken out in sinking said shaft, and in drifting, cross-cutting, and opening the lower levels.

"The ore to be taken out by said party of the first part under this contract shall be merchantable iron ore, containing at least fifty-six (56) per cent or upwards of metallic iron, and no ore of lower grade shall be accepted or pa·d for by the said party of the second part.

"The said party of the first part are to mine said ore and place the·same in the skips at No. 1 shaft in said mine, ready for hoisting, the ore to be hoisted at the expense of the said party of the second part, who agree to furnish all necessary power to properly run the skip in said No. 1 shaft for the purpose of hoisting the ore mined and placed therein by the parties of the first part, but this covenant shall not deprive the party of the second part of the right to use said skip for the purposes and in the manner hereinbefore provided. In case of any accident to said machinery, said party of the second part shall not be liable for any damages sustained by said party of the first part caused by delay in replacing or repairing said machinery, provided the said party of the second part shall cause the same to be replaced or repaired with all reasonable diligence.

"The said party of the first part are to take out all the ore which can possibly be taken out under the caving system of

mining, and in no case shall the amount taken out be less than seventy-five (75) per cent of the ore contained therein, as above agreed.

"The party of the second part are to have the right or privilege of superintending and directing said work, and for that purpose to enter said mine and inspect the works thereof at any time, for the purpose of seeing that the work is properly conducted by the said first party, and that the work so done is not prejudicial to the future interest and working of said mine.

"It is further expressly stipulated and agreed that the said party of the second part shall not, under any circumstances, be liable for any damage or injury to either person or property by reason of the carelessness or negligence of the said party of the first part or of their workmen, apprentices, or other persons in their employ, in the furtherance of this contract, and that the said party of the first part shall and will indemnify and forever save harmless the said party of the second part from all actions, claims, suits, and damages by reason thereof. In consideration whereof the said party of the second part covenants and agrees to and with the said party of the first part to pay to them, the said party of the first part, the sum of sixty cents (60 cts.) for each and every gross ton of merchantable iron ore mined and removed by the said party of the first part from the said mine under this contract, each gross ton to contain two thousand two hundred and forty (2240) pounds avoirdupois. The amount of ore shipped from said premises, and the amount due said party of the first part therefor shall be determined by and based upon the weights as ascertained by the reports of the railroad company or companies, made to said party of the second part, of the shipment of the ore from said mine, in case of the shipment of the ore so mined from said premises."

This contract was subsequently extended by the following stipulation, dated the 10th day of July, 1888:

"It is mutually agreed by the parties to the within agreement that this contract shall extend to and include the ore contained on and above the second and third levels, as named

therein, with the exception that the merchantable iron ore extracted under this contract shall contain at least 58 per. cent (fifty-eight per cent) or upwards of metallic iron."

The firm commenced the work soon after this contract was entered into and continued it until the 11th of October of that year. On February 11, 1889, they began this action in the Circuit Court of the State of Michigan for the county of Gogebic, to recover for work done and damages sustained. The defendant removed the case to the Federal court, where issue was joined, and the case went to trial before a jury, which, on September 16, returned a verdict for the plaintiffs in the sum of $5943.79. Pending the proceedings in the trial court one of the plaintiffs, Joseph H. Johns, died, and the suit was revived in the name of John Humble and James Johns, the surviving partners. Upon the verdict as returned judgment was entered, and to reverse such judgment the defendant sued out this writ of error.

*Mr. Daniel H. Ball* and *Mr. James G. Flanders* for plaintiff in error.

I. The contract sued upon was by its terms liable to be terminated. Neither party was bound to continue it, and neither would be entitled to damage against the other for terminating it, except compensation as provided by the terms of the contract.

The right was reserved by the mining company, in the contract, to terminate it whenever it should decide that the system of mining was injurious to the mine. That was left entirely with the mining company to determine. Its decision was conclusive. As it had the power to stop the work at any time, the plaintiff, of course, had the same right. They could not be bound to continue the work, while the company was at liberty at any time to decide that the system was prejudicial, and stop the work. *Finley Shoe & Leather Co* v. *Kurtz*, 34 Michigan, 90 ; *Wilkinson* v. *Heavenrich*, 58 Michigan, 574 ; *Utica & Schenectady Railroad* v. *Brincker-hoff*, 21 Wend. 139 ; *S. C.* 34 Am. Dec. 220 ; *Lester* v. *Jewett*, 12 Barb. 502 ; *Dorsey* v. *Packwood*, 12 How. 126, 136.

II. After the modification of the contract, July 10, all the ore to be taken out under the contract from any part of the mine was required to contain 58 per cent of metallic iron.

III. Under the facts in this case the damages claimed for loss of profits were too uncertain, contingent, and conjectural to found a verdict upon.

Whether any profits could be made on any ore left in the mine — or rather, whether any profit could be made in taking out all the ore of the required quality, whether 56 or 58 per cent on the first level, depended on so many unknown and uncertain conditions, that no estimate could be made of it, nor could any verdict be given therefor other than one based on pure guess work. *McKinnon* v. *McEwan*, 48 Michigan, 106; *Allis* v. *McLean*, 48 Michigan, 428.

IV. The court charged the jury substantially that if the defendant wantonly, carelessly, or negligently interfered with and hindered the plaintiffs about their work, so as to make it difficult to perform their contract, and greatly decrease the profits of it, the plaintiffs might abandon the contract, and still recover such damages as they suffered by being hindered and prevented from performing it. The error was in holding that one party to a contract, in case of failure of the other party to perform it, may abandon (*i.e.* rescind) the contract, and at the same time claim damages for being prevented from performing — or completing — it.

In the case supposed the plaintiffs would doubtless have the right to abandon or rescind the contract — refuse to proceed with it, or to continue, under the difficulties they were then wrongfully subjected to, and recover damages, under the contract, for the hindrance and delay. But the charge holds that a party may rescind — or abandon — a contract, and at the same time recover for the stoppage, on the theory that the contract remains in force. The correct rule is stated by Justice Christiancy, in the case of *Hubbardston Lumber Co.* v. *Bates*, 31 Michigan, 158, 169, as follows: "Plaintiff cannot rescind the contract, and then insist on damages for not performing; for where a contract is rescinded, an action will not lie for the breach of it." See also *Van*

*Trott* v. *Weise*, 36 Wisconsin, 439, 448; *Hunt* v. *Selk*, 5 East, 449.

V. The plaintiff Humble was allowed, against the objection of the defendant below, to testify to statements made by defendant's bookkeeper, to the effect that the superintendent of the company had forbidden him to show the railroad weighbills of the ore shipped, which were, by the contract, made evidence. There was no evidence that the bookkeeper was authorized to act for the company in any way. He was not an agent in any sense.

VI. Humble was also allowed to testify to the profits the plaintiffs had made on mining the ore they did mine, as evidence of what they might have made on what was left. This was erroneous for the reasons hereinbefore discussed, and also because past profits are no guide to what might have been made thereafter. *Masterton* v. *Mt. Vernon*, 58 N. Y. 391.

VII. The witness James Johns was allowed to testify that the superintendent Bennett told him "if we struck a good thing in the bottom level to keep it quiet, and they would call an assessment and buy in the stock; could make some money out of it, and get the stock for the assessment." This testimony could have had no other object than to impeach Bennett, who was a witness in the case. It has no bearing whatever on the issue. Its purpose was to make the jury believe that Bennett was engaged in a dishonest conspiracy to defraud the stockholders, and so affect his credibility. It needs no argument to show that this testimony was not allowable for that purpose, and that it was entirely irrelevant for any other purpose.

*Mr. Edwin F. Uhl*, (with whom were *Mr. Frank Kutts* and *Mr. Birney Hoyt* on the brief,) for defendants in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The claims of the respective parties, as stated by the court in its charge to the jury, are briefly these: Plaintiffs claimed,

first, an amount unpaid for ore mined in September and October; second, wages which they had paid during certain periods when they were delayed in the prosecution of the work by the fault of the defendant; and third, the profits which they would have made if the defendant had not prevented them from completing the contract. On the other hand, the defendant claimed first, excessive freights paid by reason of a failure on the part of the plaintiffs to produce the ore seasonably; second, damages for a failure to bring out that per cent of the ore which by the contract plaintiffs had agreed to take out of the mine; and third, damages on account of the unskilful working of the mine.

The first claim of the plaintiffs, to wit, for ore mined in September and October, is not disputed. With regard to the second, the court accepted the rule of law agreed upon by counsel for both parties, and, therefore, there is no dispute as to that. The controversy is in respect to plaintiff's claim for profits, and here many questions are discussed by counsel. We shall in our examination of them follow the order in which they are presented in the brief of defendant's counsel. The first objection to any recovery under this claim is that by the very terms of the contract the defendant was at liberty to terminate it at any time, and hence it is insisted that, even if it did so, plaintiffs were not entitled to recover any profits which they might have made had it not been terminated; that, coupled with the right to terminate, was a special provision, to wit, an award of referees for estimating the damages which the plaintiffs should sustain in consequence of such termination, and that no attempt to secure such an award was alleged or proved. To this it may be replied that the contract did not give to the defendant a right arbitrarily to terminate the contract, but only when it determined that the caving system was "prejudicial to the future welfare and development of the mine," and that there is no pretence that it ever made such determination. On the contrary, the defendant set up as a defence that the plaintiffs abandoned the work and thus broke the contract, and that it suffered great damage thereby, and on the trial the whole

scope of its testimony in this respect was in denial of the charge that it had stopped the plaintiffs from continuing the mining of ore, or in any manner sought to terminate the contract. For aught that appears to the contrary in this record, the defendant, now as ever, believes that the caving system is not only not prejudicial, but the best method of working the mine, and broke the contract with plaintiffs only for the sake of giving it to another party.

A second matter of dispute, and one which bears upon the rightfulness of the conduct of the respective parties pending the work, arises on the construction to be given to the stipulation of July 10. The original contract provided that the ore should contain at least 56 per cent of metallic iron, and that no ore of lower grade should be accepted or paid for by the company. The contention of the defendant is that this stipulation modified the contract so that thereafter all the ore taken from the mine in order to be accepted must contain at least 58 per cent of metallic iron, while the plaintiffs insist that this only applied to the ore from the second and third levels, that from the first level being subject to the provision of the original contract, to wit, 56 per cent of metallic iron. We agree with the plaintiffs in their construction of the stipulation. The original contract was only for removing ore from the first level, the company having, however, the option to extend it to the second and third levels. This stipulation provides for such an extension, but it is made expressly subject to "an exception." The use of the word "exception" indicates that something is taken out from the principal matter provided for in the clause or paragraph in which the word is found, and not that something is taken out of or changed from other provisions in other clauses of the entire contract. It will be borne in mind that this is an independent agreement, made at a subsequent time, though supplemental to and in extension of the original contract. And while for a full understanding of the scope of the obligations created by it, the original contract must be referred to, yet, in determining the import of the language used, it is to be construed as an independent agreement, and when it

makes an extension of the obligations of the plaintiffs to a new matter anything which is stated as an exception is to be taken as an exception to the obligations assumed in respect to this additional matter. If the intent was to change the stipulation as to the first level, some other word than "exception" would unquestionably have been used. It is unnecessary to refer to extrinsic testimony, of which there was some and of great significance, in order to establish the meaning of this stipulation. For, standing by itself, the fair and reasonable construction is that the stipulation as to the increased per cent was applicable only to the ore taken from the second and third levels, while as to the first level there was no change.

A third proposition of defendant is that "under the facts in this case the damages claimed for loss of profits were too uncertain, contingent, and conjectural to found a verdict upon." Profits which are a mere matter of speculation cannot be made the basis of recovery in suits for breach of contract, while profits which are reasonably certain may be. As said by Mr. Justice Lamar, in *Howard* v. *Stillwell & Bierce Manufacturing Co.*, 139 U. S. 199, 206: "But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into." See also *Cincinnati Gas Company* v. *Western Siemens Company*, 152 U. S. 200.

Now, there was in this case testimony to show the cost of mining each ton of ore, and also the amount of ore remaining in the first level of the mine at the time the work stopped. From these figures the profit which would have been made by the plaintiffs if they had completed the work of mining all the ore on the first level is a mere matter of multiplication.

It is true that the cost of mining the remaining ore might differ from that of mining the ore which had already been taken out. But still, proof of the cost of taking out that which had been mined and of the condition of the mine as it was left, furnished a basis upon which a reasonable estimate could be made as to the cost of extracting the remaining ore. Equally true is it that there was no mathematical certainty as to the amount of ore remaining in the mine. Yet, both plaintiff and defendant furnished testimony as to such amount, and testimony which, while not such as to put it beyond doubt, was sufficient to enable the jury to make a fair and reasonable finding in respect thereto. The case is one, therefore, in which the profits are not open to the objection of uncertainty, and certainly not to that of remoteness, for they would have been the direct result of carrying on the contract to a completion, and were obviously within the intent and mutual understanding of both parties at the time it was entered into.

Again, it is insisted that there was no evidence that the plaintiffs were stopped and prevented from going on with the contract. But this is a mistake; while there is no pretence that the plaintiffs were forcibly removed from the mine, there was testimony that they were directed to quit. One of the plaintiffs, John Humble, gave this account of a conversation held in October with the defendant's superintendent, and their action in consequence thereof:

"We worked from the 9th to the 11th, and then Mr. Bennett stopped me again. We had worked half a day, and at dinner time my partner and I were going together to the dry-house and Mr. Bennett came to us and said : 'You boys can stop in that third level altogether.' 'Well,' says I, 'you mean to bring our tools out?' 'Yes,' says he, 'you can run what ore you have broken in the first level and quit.' Then we went down and stopped the men in the lower level, and commenced to run out what we had in the first level, and we sent out all the tools in the mine and left. We got out all the ore we had broken on the foot-wall lens; there was no more ore left there to break except the pillar."

John Rowe testified that the defendant's superintendent told him that if he could get the plaintiffs out he would let him have the contract, and that by the superintendent's orders he ordered them to stop work. It must be borne in mind that the plaintiffs were making a profit of some thirty cents a ton in carrying on this mining, and it is hardly to be presumed that they were desirous of giving that up, and more reasonable to believe that they quit under compulsion.

In view of the verdict of the jury, which is equivalent to a finding that the defendant had broken the contract, it is unnecessary to inquire as to whether there was any error in the instructions of the court as to damages recoverable by the defendant in case the jury should find that the plaintiffs had broken the contract. It may also be remarked in passing that the court excluded from the consideration of the jury the amount of ore remaining in the second and third levels, and limited the recovery to the profits which the plaintiffs would have made if they had been permitted to continue the work so far as to remove all the ore from the first level.

Defendant also complains of the following instruction :

" If the jury find from the evidence that the plaintiffs were in good faith endeavoring to carry out and perform said contract according to its terms, and the defendant wantonly or carelessly and negligently interfered with and hindered and prevented the plaintiffs in such performance to such an extent as to render the performance of it difficult, and greatly decrease the profits which the plaintiffs would otherwise have made, then and in such case such interference was unauthorized and illegal and would have justified the plaintiffs in abandoning the contract, and would have entitled them to recover such damages as they actually suffered by being hindered and prevented from performing such contract."

It is insisted, and authorities are cited in support thereof, that a party cannot rescind a contract and at the same time recover damages for his non-performance. But no such proposition as that is contained in that instruction. It only lays down the rule, and it lays that down correctly, which obtains when there is a breach of a contract. Whenever one

party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken and desist from any further effort on his part to perform; in other words, he may abandon it, and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrong-doing of the other party has brought about. Generally speaking, it is true that when a contract is not performed the party who is guilty of the first breach is the one upon whom rests all the liability for the non-performance. A party who engages to do work has a right to proceed free from any let or hindrance of the other party, and if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop and sue for the damages which it has sustained by reason of the non-performance which the other has caused.

In the course of the trial a letter was produced, signed by the plaintiffs, and directed to the general manager of the company, in which was a statement that the first level had been practically exhausted of all commercial ore, and that not to exceed five per cent was left in it. The defendant insisted that this letter was conclusive upon the plaintiffs, but the court permitted testimony on their part to the effect that this letter was written at the solicitation of defendant's superintendent, who said to one of them that some one was reporting to the company that "they were leaving lots of ore in the first level, and he wanted to have this letter written by us to take the blame off of his back," suggesting at the same time that if anything good was discovered in the bottom level, to keep it quiet, and that they could make some money out of a speculation in the stock. The court instructed that this letter had "considerable value," as being "a statement in writing" of a party, but also that it was not conclusive, and if the testimony satisfied the jury that the facts were not as stated, they were

at liberty to so find.   We see nothing in this ruling of which the defendant can complain.   There was nothing in the way of estoppel in such a letter, and even if the plaintiffs had written it voluntarily and without any solicitation, they would not have been precluded from showing the actual facts. Much more is this the case if, as stated, the letter was written at the solicitation of the defendant's superintendent and to accomplish a wrongful purpose on his part.

Another matter is this: The contract provided that "the amount of ore shipped from said premises, and the amount due said party of the first part, shall be determined by and based upon the weights as ascertained by the reports of the railroad company, or companies, made to said party of the second part of the shipment of the ore from said mine."   In the bill of exceptions is this statement of what took place when one of the plaintiffs, John Humble, was on the witness stand :

" ' In order to get information as to the amount of ore shipped, I had to go to the office and ask the bookkeeper, and he gave me 3610 tons for the month of May.   I asked the bookkeeper to give us the weigh-bills so that we could copy them off.   There was no one present but the bookkeeper when I made this application.'

" The witness was then proceeding without further interrogatory to state what the bookkeeper said to him in answer to his application.   Defendant's counsel objected thereto as irrelevant and incompetent, but the court overruled said objection, and to said ruling defendant's counsel excepted. ,

" The witness proceeded: ' He, the bookkeeper, told me Mr. Bennett's orders were to lock those weigh-bills in the safe and keep them and give us our account off the books.   The next day I asked Mr. Bennett in the office, in the presence of the bookkeeper, to give us those weigh-bills, and he said there was no need of it as long as they copied them off from the books; that was good enough for us.' "

It is insisted that there was error in permitting the witness to give the statements of the company's bookkeeper, on the ground that such bookkeeper had no authority to speak for

the company; that his admissions were not the admissions of the company, and that what he said was mere hearsay, and tended to prejudice the jury against the company. There is no force in this objection. By the terms of the contract the amount due the plaintiffs was to be determined by the weigh-bills. They were in the possession of the bookkeeper, an officer of the company, and one of the plaintiffs applied to that officer for those bills. The reply of such officer, in possession of that made by the contract the evidence of the amount due the plaintiffs, was competent testimony. If there were any doubt as to its competency, the objection to it would be obviated by the fact that the next day the superintendent practically assented to the truth of the statement, and if the plaintiffs did not produce the weigh-bills, they certainly had a right to show why they were unable to do so, the efforts they had made to obtain them, and how it was that they failed.

These are all the questions that we deem it important to consider. We have examined the record very carefully, and find nothing in the rulings of the court of which the defendant can justly complain; and while, in view of the conflicting testimony, there is room for difference of opinion as to what the facts really were, there was testimony which, in amount and character, was sufficient to uphold the verdict of the jury, and, of course, under those circumstances, its determination is conclusive upon those questions of fact. The judgment will be                                              *Affirmed.*