The WIL–HELM AGENCY,
Plaintiff-Appellant,

v.

Loretta LYNN, Defendant-Appellee.

Court of Appeals of Tennessee,
Western Section.

March 11, 1981.

Permission to Appeal Denied by Supreme
Court June 29, 1981.

Charles H. Warfield and Stephen K. Rush, Farris, Warfield & Kanady, Nashville, for plaintiff-appellant.

Harlan Dodson and Harlan Dodson, III, Nashville, for defendant-appellee.

MATHERNE, Judge.

The Wil-Helm Agency sues for damages due to the breach of a theatrical agency contract entered into between the agency and Loretta Lynn, an artist. Loretta Lynn filed a counterclaim wherein she avers that the agency breached the contract and, therefore, owes her damages and she further alleges that the agency released her from the contract. The chancellor found that the agency had breached the contract and, in addition, had released Loretta Lynn from the contract. The chancellor further held that the amounts due each party offset each other and allowed no monetary award to either party.

The agency appeals insisting that the chancellor erred in finding: (1) that the agency breached the contract; (2) that the agency released Loretta Lynn from the contract; and (3) that the damages due the parties offset each other.

I. *Court Proceedings to Date*

This lawsuit was originally heard by Chancellor Ned Lentz, who by Judgment entered on December 1, 1971, held that certain written communications between the attorneys for the parties constituted a release of the contract by the agency as of May 8, 1971. The agency appealed that decision, and this court reversed the chancellor and remanded for a trial. The Supreme Court of Tennessee granted certiorari and by Memorandum and Order, filed October 19, 1973, set aside the Judgments of both lower courts, and remanded the lawsuit to the trial court for "a hearing on all of the issues raised in the pleadings." The basis for the remand was that under the record complete justice could not be done the parties, and it appeared that more satisfactory evidence was available upon the primary issues raised, which when presented, would enable a court to reach the proper conclusion.

On remand the lawsuit was tried by Chancellor Ben H. Cantrell, who held that the agency had released Loretta Lynn from the contract and that the agency had breached the contract. The matter was referred to the clerk and master "for a hearing as to damages and as to accounting." The clerk and master reported that, after the filing of numerous depositions, he could not ascertain the amount of damages due either party without a ruling on the law applicable to the measure of damages. The chancellor, thereupon, proceeded to consider the entire matter of damages and ruled that the damages due each party was offset by the damages each party owed the other. This appeal is from Chancellor Cantrell's rulings in the lawsuit.

II. *The Contract and Facts Surrounding the Alleged Breach Thereof*

Loretta Lynn was born in the area of Van Leer, Kentucky, and at the age of fourteen years married O. V. Lynn of that same area. A few months after the marriage, O. V. Lynn went to the state of Washington and obtained employment as an agricultural laborer. Later Loretta joined him at Custer, Washington. Loretta began singing at local gatherings and

formed a band which soon became fully booked in the area at various local places of entertainment. She appeared on the Buck Owens show and entered into a recording contract under the Zero label. Loretta wrote and recorded the song "I'm a Honky Tonk Girl," appeared on various radio shows, appeared as a guest performer on the Grand Ole Opry, and was becoming recognized as a budding young artist.

In 1961 she and her husband moved to Nashville, Tennessee. In that year she entered into her first two-year contract with the Wil-Helm Agency. Thereafter, she entered into another five-year contract with that agency. On April 12, 1966, she and the agency entered into the contract now under consideration. This contract provides in pertinent part as follows:

### WITNESSETH

1. The Artist hereby engages the Agent as his sole and exclusive personal representative and adviser in the radio, television, recording and personal appearances field of entertainment throughout the world and in outer space for a period of Twenty years (20 years)

2. The Agent's duties hereunder shall be as follows: To use all reasonable efforts to procure employment for the artist in any branch of the field of entertainment in which the Artist notifies the Agent that his services are or will be available. In addition, at the Artist's request to:

(a) Assist the Artist in negotiating with respect to all forms of advertising and commercial tie-ups in all fields, wherever the Artist's name, business likeness or voice may be used, including but not limited to the radio, television, recording and personal appearances field of entertainment.

(b) Counsel and advise the Artist in matters which concern his professional interest in the radio, television, recording and personal appearances field of entertainment.

3. The Agent hereby accepts this engagement and agrees to perform the services specified herein. The Agent shall have the right to render his services to other persons, either in a capacity in which he is hereby engaged or otherwise. However, the Artist agrees not to engage any other person to act for him in the capacity for which the Agent has been engaged. The Artist hereby represents and warrants that he is wholly free to enter into this agreement and has no contract or obligations which will conflict with it.

An Amendment of the same date was attached to the contract which provides in part as follows:

(3) This Amendment and the Agreement shall be null and void in the event there is a change of ownership in the Agency. It being the Artist (demands) that she be associated only with current management.

The contract and the amendment were signed by Smiley Wilson for the agency and by Loretta Lynn.

The Wil-Helm Agency apparently was a partnership composed of the four Wilburn brothers: Doyle, Teddy, Leslie and Lester. As we view the lawsuit, it is immaterial whether there was a change in the ownership of the agency, and the amendment to the contract will not be further considered.

The parties enjoyed several years of successful association. Loretta's popularity grew, and she is now recognized as an outstanding star in the field of country music. From 1961 through the latter part of the 1960's, the agency assisted Loretta and played an important part in her rise to stardom. Teddy Wilburn worked closely with Loretta. When the 1966 contract was signed, he was spending several hours almost daily with Loretta. He assisted her in rewriting her songs and advised her on costumes, mannerisms, and lines. Loretta was very fond of Teddy Wilburn; she sought his counsel and followed his advice. She appeared as the only female artist on the

Wilburn Brothers Show. The agency obtained a recording contract for Loretta with Decca Records. She made appearances on national television and followed a hard-working road show schedule.

In about 1967, Doyle Wilburn began to drink alcohol in excessive amounts. When drinking or drunk, he was extremely abusive and boorish. This conduct by Doyle resulted in Teddy Wilburn leaving the show in 1968. Teddy moved to California and returned to Nashville only to do certain television work. It appears that Smiley Wilson then became the member of the agency upon whom Loretta depended. Wilson did his job and aided the artist; however, she missed the expertise and experience of Teddy Wilburn. It seems that Teddy did relent and return to the show, only to leave again in 1971 for the same reason as previously stated.

With Teddy gone, it appears that Doyle Wilburn took it upon himself to be more closely identified with Loretta and her work. The record is replete with instances which reveal almost constant misconduct on the part of Doyle Wilburn acting as the agent of Loretta. Some of the more glaring instances of misconduct are: (1) insulting the producer of the Johnny Carson Show while there to close a deal for Loretta to appear on that show; (2) drunkenness on the part of Doyle Wilburn while on the stage acting as master of ceremonies; (3) actually disturbing Loretta during performances; (4) the telling of sacriligious jokes on Loretta's show in Boston, Massachusetts; (5) drunken vomiting on the dinner table at a post-performance party given for patrons, promoters, disc jockeys and their wives; (6) drunkenness throughout most of a tour in England; (7) drunkenness during the time Loretta was preparing jingles for the Coca Cola ads; (8) getting drunk and passing out during the signing of the Glo-coat contract; (9) being so drunk while emceeing Loretta's performance at a rodeo that he fell off the stage; (10) drunkenness when taping Loretta on the Ed Sullivan Show; (11) insulting the black musicians while on the David Frost Show; (12) being drunk on practically every road trip, interfering with Loretta's need for rest on the bus, ignoring instructions of airline personnel while on flights, and generally being an obnoxious drunk in the presence of people upon whom the success of the artist depended. This conduct was carried on while Doyle Wilburn was acting as the representative of the agency with whom Loretta had contracted. This conduct was known to all members of the agency; some effort was made to reason with Doyle, but to no avail.

In about October 1970 Smiley Wilson left the agency. He was replaced by Mr. Brumley who was then replaced by Leslie Hart. Hart advised Loretta that she was being woefully mismanaged and recommended that she see an attorney. Up to this time Loretta had not received independent advice on anything. The agency kept her books, handled her financing, and referred her to the agency's lawyer for any personal legal advice. Upon the advice of Hart, Loretta employed an attorney. Upon investigating the situation, the attorney wrote a letter dated April 1, 1971, to the agency saying the agency had breached the contract, and Loretta would not further abide by it. Further negotiations between the lawyers resulted in certain letters which the chancellor found constitute a release of the contract by the agency. As we view the situation, it is of no import whether the agency released Loretta from the contract; we hold that the contract was breached by the agency.

 We agree with the chancellor that the conduct of Doyle Wilburn as the representative of the agency was entirely inconsistent with the duty owed the artist under the contract. The agreement is a bilateral contract wherein each party was obligated to the other to render certain performances, the carrying out of which by each party was essential to the realization of benefits under the contract. Each party to the contract was under an implied obligation to restrain

from doing any act that would delay or prevent the other party's performance of the contract. *Fritz-Rumer-Cooke Co. v. United States*, 279 F.2d 200 (6th Cir. 1960). Each party had the right to proceed free of hinderance by the other party, and if such other party interfered, hindered, or prevented the performance to such an extent as to render the performance difficult and diminish the benefits to be received, the first party could treat the contract as broken and was not bound to proceed under the added burdens. *See: Anvil Mining Co. v. Humble*, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814 (1894). *See also*: 1 Restatement, Contracts, § 315 (1932); 4 Corbin on Contracts, § 947 (1951).

■ There is ample material evidence that the agency, by the conduct of its representative, committed a substantial breach of its contract with Loretta Lynn. The chancellor is affirmed in this respect.

### III. *Damages*

The chancellor referred the question of damages to the clerk and master, but, after the taking of considerable proof, that official passed the issue back to the chancellor without making a finding of any kind. Thereupon, the chancellor found as follows:

After sifting through the proof and after reviewing the previous Memorandum and the orders based on it, the Court concludes that the claims of the parties off-set each other and should be dismissed. The plaintiff Agency claims $178,556.72 due on the contract up until the date of termination with allowances for dates already booked to November of 1971. The defendant counter-claimed for damages for breach of the management agreement. The proof shows that the defendant was being booked at a fee of $2,500.00 to $4,000.00 per appearance up until the date of termination of the agreement while an artist·of her stature should have commanded a much higher figure. A simple calculation based on the number of dates she worked in a few years prior to 1971 shows how much of a loss that was. In addition, the failure to expose her to national television and the stress of the conditions under which she worked result in damages that are reasonably certain and should off-set the plaintiff's claim.

The Court declines to speculate on the amount of damages the plaintiff would be entitled to if the decision had been otherwise.

We accept the figure of $178,556.72 as the amount due the agency under the contract up until the date of termination with allowances for dates already booked to November 1971. The artist claims that this amount can not be awarded to the plaintiff agency because the plaintiff breached the contract and is not entitled to any amount thereunder. We disagree with the artist in this respect.

■ The record reveals that the plaintiff agency committed a substantial breach of the contract. The defendant artist did not commit any breach of the contract. Therefore, if the plaintiff is to recover at all, it must do so upon the theory that it has rendered a part performance of value, that it has done more good than harm to the artist, and that the artist will be unjustly enriched and the plaintiff unjustly penalized if the artist is allowed to retain the beneficial part performance without paying anything in return. 5A Corbin on Contracts § 1124 (1964). By the same token, the plaintiff is the wrongdoer, and it must not be allowed to profit from its own wrong. Therefore, allowance must be made to the defendant artist in damages for the full extent of the injury that the plaintiff's breach has caused her. *Corbin, supra.* Under the facts of this bilateral contract, whereby each party agreed to carry out certain performances in return for performances by the other party, we conclude that the plaintiff agency is entitled to its commissions based upon its part performance less the amount of the injury to the artist

caused by the breach. Having accepted the figure of $178,556.72 as the amount due the agency for its part performance, it must now be determined in what amount, if any, the artist was damaged by the breach.

The defendant artist averred by counterclaim that due to the conduct of Doyle Wilburn, she had been deprived of engagements as an artist, that she had suffered physical and emotional distress and had been rendered unable to perform to her capacity, and that subsequent to the breach and the termination of the contract, the agency had held itself out as the sole and exclusive agent of the artist thereby depriving her of engagements and the resulting revenues therefrom. By amendment to the counterclaim, the artist averred that over the years the agency had booked her for engagements at a price below that to which she was entitled and had entered into a recording contract for her at a rate substantially less than her professional ability demanded, all to her financial detriment and in breach of the agency's duties under the contract.

As noted, the chancellor found (1) that the artist was booked at a fee below that which an artist of her stature should have commanded, and (2) that the stress of the conditions under which she was forced to work resulted in damages that are reasonably certain.

■ There is competent and material evidence that Loretta Lynn won more awards, had a larger following, and was more sought after than any other artist in her field of entertainment. There is competent and material evidence that artists of less ability, following, and demand were drawing from $5,000 to $7,500 for a performance during the late 1960's and up to 1971. There is ample proof that Loretta Lynn should have been drawing those amounts instead of the $2,500 to $4,000 range in which she was booked. The plaintiff agency presented proof (Exhibit 53) which purported to list every performance of Loretta Lynn for which the agency claimed a commission. From a review of the number of those performances and an application of a reasonable average fee at which the artist should have been booked, the chancellor concluded that the damage she suffered from having been "underbooked" for several years more than offset the amount proved by the agency as owing to it.

The chancellor properly held that strain and stress unnecessarily suffered by the actress due to the conduct of the agency representatives resulted in damages for which the artist could recover. There is ample material evidence to sustain the finding that the conditions under which she had to work, rendered the artist nervous, uncertain, dismayed, and embarrassed, all to her professional detriment through no fault of her own.

Although not ruled on by the chancellor, we find another element of damage to the artist based upon the recording contract it entered into for the artist with Decca Records. It seems that in the early years of the recording industry a recording company suffered substantial losses due to records being broken while in transit to the buyers. As a result, a custom built up that when contracting with an artist the recording company would deduct 10% from the sales figures to take care of this breakage, and the artist was paid a royalty based upon 90% of the sales figure. Later records were made of plastic or some other material not subject to the breakage previously sustained. The proof establishes that as of 1966, when Decca contracted to record Loretta, all recording contracts being renewed and all new contracts being entered into provided for a royalty based upon the 100% figure. This was done at the mere request of the artist or agent. However, the plaintiff agency booked Loretta at a royalty based upon the 90% figure. In 1972, after the parties had gone their separate ways, Decca voluntarily changed the contract so as to pay royalties on the 100% figure. There is material evidence that the loss

suffered by the artist because of this breach of duty on the part of the agency amounted to approximately $200,000 during the period from 1966 to 1971.

We, therefore, agree with the chancellor that the damages suffered by the artist more than offset those amounts claimed by the agency for its part performance of the contract. Admittedly, neither the chancellor nor this court fix the actual amount of damages to which the artist is entitled due to the breach of the contract by the agency. We have, however, fully satisfied ourselves that the damages thus suffered exceed the amount due the plaintiff agency. The artist did not appeal. We conclude that under all the circumstances of this lawsuit, the chancellor's decree is supported by a preponderance of the evidence, and that decree is affirmed.

The cost in this court is adjudged against the appellant, Wil-Helm Agency, for which execution may issue, if necessary.

SUMMERS, J., concurs.