**ACTION ENGINEERING, Plaintiff**

**v.**

**MARTIN MARIETTA ALUMINA, Defendant**

Civil No. 77-12

District Court of the Virgin Islands

Div. of St. Croix

June 2, 1981

ROBERT ZIMMERMAN, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

DAVID O'BRIEN, ESQ. (O'BRIEN & MOORE), Christiansted, St. Croix, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

### I

This contract action was tried to the Court sitting without a jury. On the basis of the facts found and the applicable law, as set forth below, the Court finds that defendant Martin Marietta Alumina (hereinafter "MMA") breached its contract with plaintiff Action Engineering (hereinafter "Action"). Relief will be in the form of restitution.

### II. STATEMENT OF FACTS

This case arises from a contract to construct two bulk lime holding silos at the MMA processing plant on St. Croix. MMA had encountered a variety of problems with its small bag lime handling process. In early 1976 a bulk handling process was conceived and approved, and the bidding process was begun. (T. McColgin.)

MMA engaged an engineering firm to draw up the specifications for the lime silos. MMA included these specifications in its bid invitation. The terms of the invitation, to the extent here involved, called for a bid encompassing: working plans drawn to MMA's specifications, fabrication of the required material, transportation of the material to the site and erection of the two silos. (T. McColgin and Gale.)

Action Engineering was a construction firm organized to handle work on St. Croix. The company president, Gene Gale, resided in St. Thomas. The St. Croix supervisor was one James Johnson. Action

received MMA's bid package and prepared a bid. This preparation entailed several site inspections, several conferences and consultation with Plant City, a steel fabrication concern. On March 19, 1976, Action submitted its bid. (Def. ex. A.) Subsequently, on April 19, 1976, Action submitted a second bid, reflecting an increase of approximately $5,000.00. The second bid was for $212,863.00 (def. ex. A) (T. Gale and McColgin).

On April 29, 1976, a conference was held between representatives of MMA, MMA's engineers and Action. At this meeting a tentative contract was discussed. Action explained the $5,000 increase in its second bid (higher quality paint). Certain changes were made in the MMA project specifications: nozzles were relocated and steel was added to various catwalks. These changes were recorded in a revised drawing. (T. McColgin and McGowan; def. ex. C.) There was testimony that Action recognized that these revisions would increase the contemplated costs of materials, but that Action, it seems, decided to absorb this cost increase. (Def. ex. C; T. McGowan.) It is clear that the revisions were intended to be a part of the contract specifications and were properly incorporated therein. The parties agreed to the terms of the contract at this meeting.

On May 10, 1976, MMA issued a purchase order accompanied by "General Terms and Conditions for Construction Contracts" (def. ex. B). As of that date these two documents comprised the written contract between Action and MMA. The contract price was $212,863.00. Included among the terms were the following:

Item 2: required that the contractor submit a work schedule to the owner, for the owner's approval and provided that "contractor recognizes and agrees that time is of the essence in this contract"

Item 7: provided that "If in owner's opinion, contractor fails to ... work ... on schedule ... owner shall have the right ... to terminate this contract forthwith ..."

Problems developed with the working plans submitted by Action and prepared by its consultant, Plant City Steel. As per the contract, these plans were subject to the approval of MMA's engineers. At a meeting in Florida, MMA's engineers informed Action and Plant City that certain changes had to be made in order to conform the plans to contract specifications. These changes resulted in an increase in the amount of steel originally estimated by Plant City. The parties, at this meeting, also discussed several other factors which had increased the estimated amount of steel required: the

489

revisions agreed upon in the April 29, 1976, meeting, miscalculations in the rough estimates made by Plant City and engineering errors made by Plant City. MMA did not agree to assume any of the increased costs but did state that a detailed list of extras involved should be submitted and that MMA would consider whether remuneration was justified (def. ex. D & E; T. McGowan).

Delays developed in the construction of the silos. Two conflicting stories were presented as to the cause of these delays.

On the one hand MMA urges that construction delays resulted from Action's choice of an "off-site sub-assembly" method of construction. (T. McColgin and Wilcox.) On the other hand Action insists that the concededly inefficient "off-site sub-assembly" construction method was forced on it by MMA's failure to provide both silo foundations on September 23, 1976, as required by the construction schedule.[1] (T. Gale; def. ex. F.) The facts indicate that the inefficient construction method was indeed the chosen approach of Action's St. Croix supervisor, James Johnson, and not the result of the staggered availability of the silo foundations. One basis for this conclusion is a letter from Johnson to MMA on August 27, 1976 (pl. ex. 1). This letter states that "*jig* preparation and preliminaries shall start the first week of September" (emphasis added). One of the distinguishing features between the construction method used and the construction method which Action claims to have been forced to abandon, is that the former requires the use of a "jig",[2] while the latter does not.

Indeed, Action states that the allegedly imposed "off-site sub-assembly" construction method had the following negative effect: "jigs and forms not otherwise required were made necessary". (Plaintiff's proposed finding of fact 10(C).) On August 27, 1976, Johnson had no way of knowing whether both silo foundations would not be completed as scheduled on September 23, 1976, nevertheless Johnson refers to the use of jigs which Action concedes were distinctive to the "off-site sub-assembly" construction method. More impor-

---

[1] The concrete foundations for the silos were scheduled to be prepared for Action by September 23, 1976. Only one foundation was ready on that day. Work continued on the second foundation and it was available to Action in mid-October. (T. Wilcox and Gale; def. ex. F.)

[2] A "jig" is much like a mold or a form. Action used a "jig" on this project to sub-assemble the steel rings used on the silos. The rings came from the fabricator in several pieces. The "off-site sub-assembly" method entailed placing these pieces on the jig, welding them into a ring and transporting the completed rings to the job site. (T. Gale.)

tant to the finding that the off-site construction method was not the result of MMA's delinquence in site preparation is the fact that Action never abandoned the off-site method. When the second foundation became available in mid-October, Action did not switch to the more efficient construction method which, it insists, MMA's delays had caused it to abandon. Indeed on December 1, 1976, work was still being done by the off-site sub-assembly method. (T. Gale & Wilcox.)

By October 19, 1976, Action's work was decidedly behind schedule. On that date Johnson wrote two letters to MMA, attributing this situation to MMA's tardiness, and stating that construction would remain five weeks behind schedule. (Def. ex. J and K.) The original construction schedule had called for Action to complete its work on November 1, 1976. That date went by, however, and the work was, as we have noted, far from completion.

On November 10, 1976, Action sent MMA a revised schedule for completion of the two silos (def ex. C). It specified what work was to be done in each of the upcoming weeks, with work completion projected for December 25, 1976. MMA accepted the revised schedule (Wilcox).

On December 1, 1976, without prior notice, MMA informed plaintiff that their contract was terminated (def. ex. M; T. Gale), and ordered plaintiff to leave the site. Action sought to negotiate the matter but was rebuffed by MMA (pl. ex. 6; T. Gale). As of December 1, 1976, Action had been paid $166,230.68 for its work on the silos.

Prior to terminating its contract with Action, MMA had contracted a replacement contractor and had solicited a bid for the completion of the work. (T. Wilcox.) A bid of $31,600 by this substitute contractor was accepted by MMA. Riggers & Erectors, the firm which replaced Action, was to begin work on December 15, 1976. However, it was not until January 15, 1977, that they actually started (def. ex. A; T. Wilcox and McColgin). In addition, a third contractor was retained to complete the painting of the silos at an agreed price of $9,600 (pl. ex. 10). The erection work was completed in the third week of February and full use of the bulk handling equipment was achieved on April 1, 1977. (T. McColgin.)

The parties hotly dispute the extent of work completed as of December 1, 1976. MMA asserted that none of the items scheduled for the period of November 21 thru December 4 were completed as of December 1; although it concedes that work had begun on all those items and three days remained for those portions of the

491

revised schedule. (T. Wilcox.) Action stated that all but one of the items scheduled for this period were completed. (T. Gale.)

Each side presented expert witnesses who expressed opinions as to the state of completion of the job as of December 1. The experts based their opinions on photographs of the silos, taken near the termination date, and their knowledge of what was involved in the work remaining undone. MMA's expert stated that the job was 40% to 45% complete if the pieces shown to be in place on December 1 were not finish welded. (T. McGowan.) Action's expert stated that if the pieces in place were only tack welded, the job was 60%–64% complete as of termination; and if the pieces in place were finish welded, the job was 70% complete as of termination. (T. Dei.) MMA said that the welds were not complete. (T. Wilcox.) Action said that the welds were substantially complete. (T. Gale.) MMA said that on the basis of past work progress and ongoing supervisory and labor problems, it did not believe that the job could be finished by the revised deadline. (T. Wilcox.) Action stated that the job could be substantially completed by the revised deadline and that it was prepared to make the extra efforts to insure completion. (T. Dei and Gale.)

Action's expert gave a more thorough basis for his opinion. He totalled the remaining work hours and estimated that a crew of twelve could complete the job by December 25. (T. Dei.) The photographs support a completion estimate in the 60%–70% range, rather than the 40%–45% range, particularly in the light of the uncontroverted testimony that the assembly of the cones (in place on December 1) is the most time consuming aspect of the job and the testimony that much of the painting work had been completed by the steel fabricator.[3] (T. Gale.) Since we cannot determine whether the pieces in place were merely tack welded on December 1 or were finish welded on that date, we will take a rough average of Action's expert's estimates and we conclude that the work was 66% complete as of December 1.

Action submitted various expenses related to the silo construction project. These expenses were not challenged by MMA. A summary of the expenses is as follows:

---

[3] The steel was sandblasted and primed by Plant City. The priming of the weld areas and the application of finish coats remained to be done, as of December 1. (T. Gale.)

| Labor              | $  25,344.96 |
| Shipping & Trucking |     21,435.47 |
| Materials          |    117,049.63 |
| Equipment          |     28,915.89 |
| Total              | $192,743.95 |

Action added various charges to these expenses: a 5% small tool's charge ($9,637.20) bringing expenses to $202,381.15 and a 20% overhead charge ($40,476.23), bringing the total to $242,857.38. From this sum Action subtracted the $166,230.68 which it received from MMA, reducing the total to $76,626.70. To this sum Action added a 9% profit charge ($6,896.40) bringing its total claim to $83,523.10.

MMA submitted evidence as to its loss from the delay in getting the bulk lime handling process into full use. MMA claimed a $500 loss for each day the bulk process was delayed. MMA argues that a 37-day delay (from February 22-April 1st) was caused by Action and seeks $18,500.00 in damages.

### III

The Court must address the three claims presented by these parties: (a) Action's assertion that the termination of its contract was wrongful; (b) Action's further contention that the original project specifications were altered, increasing the material costs; and (c) MMA's claim that Action's delays on the project caused it to suffer loss for which it is entitled to recover damages.

### TERMINATION OF THE CONTRACT

We are here concerned with a construction contract in which the contractor, Action, exceeded its time allotment; the owner, MMA, agreed to an enlargement of that time, but nonetheless terminated the contract prior to the expiration of the new time allowed. As set out below, we find that the evidence is insufficient to justify MMA's termination and thus MMA breached the contract.

Ten days after the originally scheduled completion date, Action submitted a revised construction schedule. By the terms of the contract Action was, at the time, in default. MMA could have rejected the revised schedule and terminated the contract. MMA chose not to do so. Rather, it accepted the revised schedule. MMA correctly maintains that its acceptance of the revised schedule constituted a modification of the contract.

A material term or condition of a contract cannot be modified or waived unless the modification or waiver is supported by the requisites for the creation of a new contract (Restatement of Con-

493

tracts § 297). MMA's acceptance of Action's revised schedule was a waiver or modification of the completion date in a "time is of the essence" contract. In the context of a construction project which involves sequential work of various contractors and takes place in an ongoing industrial plant, a time is of the essence clause is clearly material. MMA's acceptance of the revised schedule was supported by the required offer, acceptance and consideration[4] and thus became a binding modification of the contract.

■ Of course, the modification merely altered the time schedule of the contract. The "time is of the essence" and termination clauses in the original contract remained in effect, though tempered by the new completion date.

■ The termination clause stated that if MMA was of the "opinion" that Action was behind schedule, MMA could terminate the contract. Mere "opinion" cannot be the basis for a termination clause, for, if it were, the contract would be illusory. Reasonableness must be read into the termination clause (see Restatement of Contracts § 265, illustration No. 4). If there was a reasonable basis for MMA's opinion that Action was behind schedule on December 1, then MMA properly terminated the contract. If there was no such reasonable basis for MMA's action, it breached the terms of the contract.

■ Definition must be given to the phrase: "a reasonable basis for MMA's opinion". The case of Commercial Contractors, Inc. v. United States F. & G. Co., 524 F.2d 944 (5th Cir. 1979) parallels the fact situation of the instant case. In Commercial Contractors, Inc., the Fifth Circuit said:

Hence, Commercial (in the instant case MMA) could invoke the right to terminate at any time that the subcontractor (in this case Action) failed to substantially perform according to schedule. The contract did not require Commercial (again MMA) to await the time for full performance before it could exercise the

---

[4] Waiver of a good faith claim can be consideration for a promise. United States v. James Construction Co. (M.D. Tenn. 1972). 390 F.Supp. 1193, 1210. Action's letters of Oct. 9 demonstrate Action's belief that any delay in construction was attributable to hindrances created by MMA. A condition (such as timeliness) can be excused by the obstruction of the party to benefit from the condition. Restatement of Contracts § 295. Sufficient interference allows a party to cease work and treat the contract as breached. Anvil Mfg. Co. v. Humble, 153 U.S. 540 (1894). Thus MMA's promise to extend the construction deadline to December 25, 1976, was supported by the consideration of Action's waiver of its good faith "hindrance" claim.

power of termination. Even though Ehridge (here Action) may have been granted extensions due to various causes, it could nevertheless be found in breach if a determination were made that, notwithstanding extensions, *substantial performance would not have been delivered by the date of the new schedule deadline.* (Emphasis in original.) Id. at p. 955.

Thus MMA's opinion has a reasonable basis if the evidence shows that substantial performance would not have been delivered by December 25, 1976.

■ We find on the evidence presented, that the project would have been substantially completed by December 25th. As noted above, Action received a completed foundation and began work as scheduled on or about September 23, 1976. It chose to use a sub-assembly method of construction and followed this procedure to termination on December 1. There is no indication that it intended to alter its construction method in the remaining period of the contract. (On December 1 there was still at least one sub-assembled ring at the off-site field.) The modified contract called for completion on December 25; thus from September 23, Action had 94 days to complete its work. On December 1, 68 days had elapsed, 73% of the contract time. On December 1, 66% of the work had been completed. If Action continued at its previous pace, in the remaining 25 days it would have completed another 23.75% of the work. Thus it is reasonable to conclude that at that rate, approximately 89% of the project would have been completed on December 25. But Action presented testimony that it would have increased its efforts if MMA's December 1st notice had been a warning rather than a termination. Although this is self serving testimony, it seems reasonable to believe that, faced with the possibility of loss of the job, the necessary additional effort would have been made, and the Court so finds. With the added exertion, the job, if not 100% completed by the deadline, would have been so close to that point that a finding of substantial completion would have been fully warranted. We conclude therefore that MMA wrongfully terminated the contract.

### COUNTERCLAIM: DELAY

MMA has counterclaimed for losses allegedly incurred due to Action's untimely performance. The evidence does not support this claim.

■ As noted, the contract was modified by MMA's acceptance of the revised construction schedule. This modification necessarily

included an advancement of all work slated to follow Action's portion of the silo project. Action's completion date was moved forward from November 1 to December 25, an increase of 55 days. The original schedule contemplated completion, including start up, on January 15, 1977. This date was advanced 55 days by the contract modification, thus commencement of operations could have been expected on March 10, 1977. As it turned out completion occurred on April 1, 1977, some 20 days later than the modified contract date. It was not until 45 days after MMA's wrongfully termination of the contract with Action that the replacement contractor began work. For this 45-day delay MMA has no one but itself to blame. But for the termination there would have been no start-up delays of a new contractor. Final completion was only 20 days behind the revised time-table. MMA's action resulted in a 45-day delay, in no way attributable to the revised schedule or to Action. The counterclaim must, therefore, fail.

## INCREASED MATERIAL COSTS

■  Action claimed that its material costs were increased by MMA's belated changes in the project's specification and plans. The evidence does not bear this out. On the contrary the evidence shows that Action's increased material costs were caused by revisions agreed to by Action, engineering errors by Action's consultant and estimating errors in bid preparations. Accordingly, Action's material claim must fail.

## RELIEF

■  According to the Restatement of Contracts, applicable by virtue of 1 V.I.C. § 4, Action is entitled to restitution. MMA breached the contract through its wrongful termination and thus is not entitled to the protection of the contract price in the determination of appropriate relief.

Relief may take any one of three forms upon the material breach of a contract: contract damages, restitution or specific performance. The injured party has the option of electing which remedy is pursued. § 381 Restatement of Contracts.

Although the Restatement of Contracts specifies the appropriate manner for determining damages for the breach of a construction contract, there is no indication that relief is limited to damages in such cases. § 346 Restatement of Contracts. On the contrary, the Restatement section which establishes the right to alternative relief contains an illustration which clearly indicates that either damages

496

or restitution is available as relief upon the breach of a construction contract. § 381 Restatement of Contracts, illustration No. 1. (See also § 347 Restatement of Contracts, illustration No. 4.)

Action has properly opted for redress by way of restitution. From the outset, it has sought money in excess of the contract price. There has been no last minute shift in the relief sought. § 381 Restatement of Contracts. Action qualifies for the relief it seeks. MMA's breach was total and prevented further performance by Action. § 347 Restatement of Contracts, comment e. MMA has received the benefits of Action's partial performance: all materials remained on the construction site and MMA received the products of Action's labors. § 348 Restatement of Contracts. There is no need for Action to return any consideration it received from MMA, because the consideration was in the form of money and can be credited to MMA. § 349(2)(C) Restatement of Contracts. There was no full performance by Action. § 350 Restatement of Contracts. There has not been any part performance for which the contract provides a specific apportioned exchange, nor has part performance been rendered after knowledge of MMA's repudiation, §§ 351 and 352 Restatement of Contracts. In sum all of the criteria by which the Restatement determines eligibility for restitution have either been met or are not here applicable.

The fact that Action would have lost money on the contract, had it been permitted to complete its work and been paid the contract price, is no bar to restitution. The Restatement contains no such limitations[5] except in the situation wherein the defendant is justified in refusing to perform because of the plaintiff's own

---

[5] The court recognizes that the rationale of comment e, § 350 Restatement of Contracts, could lead to a contrary conclusion. Given the context of comment e (where full performance has been rendered) and the absence of any specific provision limiting restitution to the contract price, we find no reason to expand upon the rationale of comment e. Further, the court recognizes that Tentative Draft No. 14 Restatement of Contracts 2d, § 387(2) (March 1979) does limit relief to the contract price. The rationale for the Tentative Draft position does not adequately justify permitting a breaching party to enjoy the protection of the very contract it breached and thus we do not in this instance hold in accordance with the position expressed in the tentative draft. 1 V.I.C. § 4 binds us to the Restatements "approved by the American Law Institute . . . in the absence of local law to the contrary." Although this court has tempered its reliance on the Restatements in view of the date of their publication, James v. Bailey, 10 V.I. 382 (D.V.I. 1974) and on occasion we have utilized the tentative drafts, Demco Builders v. Thermal Engineering, 1979 St. T. Supp. 97, 105 (D.V.I.), we are in no manner obligated to accept positions proposed in the tentative drafts.

breach. § 357 Restatement of Contracts.[6] By implication, when defendant's breach has not been justified by plaintiff's conduct, the contract price sets no ceiling for relief by way of restitution. Equating quantum meruit with restitution, the Fourth Circuit Court of Appeals held, "[t]he impact of quantum meruit is to allow a promisee to recover the value of services he gave to the defendant irrespective of whether he would have lost money on the contract . . . ." United States v. Algernon Blair, Inc., 479 F.2d 638, 641 (4th Cir. 1973). We believe the position espoused by the Fourth Circuit to be sound, and adopt it.

▉▉▉▉▉ "For the total breach of a contract, the injured party can get judgment for the reasonable value of a performance rendered by him, measured as of the time it was rendered, less the amount of benefits received as part performance of the contract and retained by him . . . ." § 347 Restatement of Contracts. Plaintiff's performance ". . . is to be valued . . . by the amount such services and materials as constituted the part performance could have been purchased from one in the plaintiff's position at the time it was rendered . . . . The rate of payment agreed upon in the contract is admissible in evidence on the question of value, but it is not conclusive" id. comment c. United States v. Algernon Blair, supra; St. Paul—Mercury Indem. Co. v. United States ex ul. Jones, 238 F.2d 917, 924 (10th Cir. 1956); United States for Use of Susi Contracting Co., 146 F.2d 606, 610–11 (2nd Cir. 1944); Scaduto v. Orlando, 381 F.2d 587, 595–96 (2nd Cir. 1967).

Two pieces of evidence shed light on the reasonable value of the services rendered by Action: the contract price ($212,863.00) and Action's figures for actual cost plus a 5% small tool charge, 20% overhead charge and a 9% profit charge on the amount unpaid as of the termination date ($249,753.78). The various extra charges and percentages accompanying them were said to be the regular custom of the construction trade. This was uncontroverted. Since another contractor would charge the 9% profit on the total of the actual costs plus charges, we see no reason to limit the 9% charge only to the unpaid balance as of termination date; we will increase Action's figures to reflect a 9% profit charge on all costs; this results in a sum of $259,125.22.

---

[6] Section 357 Restatement of Contracts might have applied to this case had MMA terminated Action on November 1. By agreeing to the revised schedule MMA, in effect, waived Action's breach and thus cannot rely on that breach to limit Action's right to recover.

One approach to valuing the services rendered by Action is to assume that since 66% of the work was completed, the work was worth 66% of the contract price. This approach ignores three factors: firstly, all the shipping and material expenses plus much of the equipment expenses had already been paid for and the benefit of these expenses had already been received by MMA (all materials remained on the site after the contract was terminated); secondly, there was testimony by both parties that Action was seeking to get its foot in the door at MMA and was willing to absorb losses on this contract in the hope of obtaining future contracts with MMA; and thirdly, Action was the successful bidder on this contract. Thus it may be assumed that other local contractors would have charged more for the job. All these factors tend to increase the value of the services rendered beyond 66% of the contract price.

Another mode of evaluation would be to accept the actual expenses incurred by Action to complete the work it did and to accept the 9% profit charge which another contractor would certainly seek. This means, however, ignores the fact that the construction method used by Action was conceded to be inefficient by both parties. Another contractor, using a more efficient construction method would not have incurred the same costs to perform the identical work.

The court concludes that the most equitable method of determining the reasonable value of the services rendered would be to deduct the cost of the inefficient construction method from Action's actual costs and to apply the various charges to the figure thus determined. The most effective method of determining the costs of the inefficient construction method is: first, to determine the amount of time lost by this method and thereby determine a percentage of the total time lost due to the inefficient construction method; second, to determine those items of Action's costs which were affected by the inefficient construction method; and third, to reduce the effected items by the percentage so determined.

We find that 57% of the time expended on the construction of the lime silos is attributable to the inefficient construction method used by Action. This figure is reached by:

(1) noting that Action's original bid contemplated 38 days for completion of construction;[7]

---

[7] The evidence indicated that at the time the bid was made Gale contemplated the use of a more efficient "alternating" method of construction, thus the 38 days figure seems an appropriate starting point.

.

499

(2) noting that construction was 66% complete on December 1;

(3) concluding that the work done by December 1 could have been completed in approximately 25 days (66% of 38 days) with an efficient construction method;

(4) noting that 68 days elapsed from the date construction began, September 23, until termination, December 1;

(5) finding that the first 21 days of construction cannot be given full weight in this computation because only one pad was available from September 23 to October 14;

(6) concluding that it is appropriate to reduce the 21-day period of one pad availability to 10 days, for purposes of this computation;[8]

(7) concluding that 58 days were expended by Action to achieve 66% completion by the inefficient construction method;

(8) concluding that 33 extra days are attributable to the inefficient construction method; and

(9) concluding that 57% (33 of 58 days) of the time expended is attributable to the inefficient construction method.

We find that the following items among Action's actual costs were affected by the inefficient construction method and therefore should be reduced by 57% in determining the restitutionary award:

| | |
|---|---:|
| (1) Labor: Actual costs | $25,344.96 |
| -57% | 14,446.62 |
| | $10,898.34 |
| | |
| (2) Equipment: Actual costs | |
| for crane rental | $21,351.85 |
| -57% | 12,170.55 |
| | $ 9,181.30 |
| | |
| —which reduces actual costs | |
| for equipment to | $14,114.80 |
| +10% (fuel, lub. & maint.) | 1,411.48 |
| Total | $15,526.28 |

---

[8] This reduction is based on the fact that only 50% of the job site was available, leading to the conclusion that only 50% efficiency could be obtained during the first 21 days.

■ Accordingly we find that the reasonable value of the services rendered by Action and received by MMA is as follows:

| | |
|---|---:|
| Labor | $ 10,898.34 |
| Shipping & Trucking | 21,435.47 |
| Materials | 117,049.63 |
| Equipment | 15,526.28 |
| | $164,909.72 |
| +5% small tools | 8,245.48 |
| | $173,155.20 |
| +20% overhead | 34,631.04 |
| | $207,786.24 |
| +9% profit | 18,700.76 |
| | $226,487.00 |
| -prior payments | 166,230.68 |
| | $ 60,256.32 |

■ Action is entitled to interest on this sum at the statutory rate. Interest is to be computed from the date of termination, December 1, 1976. § 347(2) Restatement of Contracts. A judgment may be entered accordingly.